# United States Court of Appeals
## For the First Circuit

Nos. 02-1537, 02-1828, 02-1843, 02-2258

BOSTON AND MAINE CORP.; SPRINGFIELD TERMINAL RAILWAY CO.;
GUILFORD TRANSPORTATION INDUSTRIES, INC.,

Plaintiffs, Appellees/Cross-Appellants,

v.

TOWN OF AYER; AYER BOARD OF SELECTMEN; AYER PLANNING BOARD;
AYER BOARD OF HEALTH; PAUL D. BRESNAHAN; CONNIE F. SULLIVAN;
ROBERT J. PENA; WILLIAM OELSKE; JAMES F. FAY; JAMES F. WILLIAMS;
JAMES LUCCHESI; THOMAS GIBBONS; LAURI J. ROSAS;
MARGARET M. KIDDER; C. JANE WITHEROW,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Circuit Judge,
Bownes, Senior Circuit Judge,
and Howard, Circuit Judge.

Leonard H. Kesten, with whom Jocelyn M. Sedney, Deidre
Brennan Regan, and Brody, Hardoon, Perkins & Kesten were on brief,
for appellants.

William S. Eggeling, Nikolas P. Kerest, Michael T.
Marcucci, and Ropes & Gray on brief for Conservation Law
Foundation, Town of Littleton Water Department, Massachusetts
Municipal Association and National League of Cities, amici curiae.

Eric L. Hirschhorn, with whom Winston & Strawn and Robert B. Culliford were on brief, for appellees.

Louis P. Warchot and Michael J. Rush on brief for Association of American Railroads, amicus curiae.

_____

May 21, 2003

_____

**LYNCH**, **Circuit Judge**. Guilford Transportation, which runs the Boston & Maine railroad, owns a railroad yard in Ayer, Massachusetts. In 1997, in order to expand its storage capacity, Guilford[1] purchased land, the San Vel site, which lies across the street from its railroad yard and is bounded by two railroad tracks. The site is in an aquifer protection area. Understandably, Ayer sought protection for the aquifer.

Guilford accordingly sought permits from the town and attempted to reach agreements. These negotiations broke down when the town Planning Board imposed thirty-six conditions on issuance of any permit and another town body, the Board of Health, declared the proposed plan to be a noisome trade, allowing Guilford's activities to be banned outright. Concerned that these town actions effectively prohibited or unduly burdened its planned operations, Guilford went to federal court to seek a declaration that Ayer's efforts were preempted.

After the parties filed cross motions for summary judgment, the district court (with the parties' agreement) sought the views of the Surface Transportation Board (STB) on October 19, 2000.[2] The Board gave its views to the court in decisions served

---

[1] Throughout this opinion, we will refer to the plaintiffs collectively as "Guilford."

[2] Under 5 U.S.C. § 554(e) (2000), an agency "with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." See 49 U.S.C. § 721 (2000) (powers of STB).

on May 1 and October 5, 2001. The court entered judgment for Guilford, but without the declaratory or injunctive relief Guilford had sought. It also awarded attorneys' fees and costs of $286,839.49 to the railroad under 42 U.S.C. §§ 1983 and 1988 (2000).

Ayer appealed, arguing it had at stake important environmental interests, buttressed by the Clean Water Act, 33 U.S.C. §§ 1311-1330 (2000) and the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-26; that none of its actions are preempted; and that the railroad is not entitled to attorneys' fees. The Conservation Law Foundation, the Town of Littleton Water Department, the Massachusetts Municipal Association and the National League of Cities and Towns, as amici, supported reversal of the district court decision.

Guilford sought affirmance of the district court's orders, but cross-appealed, saying it was entitled to a declaratory judgment and an injunction against the Town, relief the district court omitted to give it. Guilford was supported on its view of preemption by the Association of American Railroads as amicus.[3]

The parties presented the case as a pure conflict between the strong federal interest in a uniform system of railroad regulation and the strong local interest in protecting water

---

[3] The court expresses its appreciation to both sets of amici for their assistance.

supplies. As the ensuing discussion shows, the law presents much more nuanced accommodations.

At oral argument, we sought a practical solution to a portion of the case and requested that the parties meet with this court's Civil Appeals Management Program (CAMP) to see if they could negotiate an agreement as to Guilford's voluntary compliance with certain conditions. Admirably, the parties have reported back that they have reached partial settlement through an agreement on the conditions under which Guilford will proceed with the development, construction, and operation of an automobile unloading facility at the San Vel site, thus mooting that aspect of the case. They have asked us to dismiss the appeals in cases Nos. 02-1537, 02-1828, and 02-1843, and aspects of case No. 02-2258, and to remand them with instructions to the district court to enter a consent decree. Thus, we do not reach the substance of these issues.

That leaves for decision only the issue in case No. 02-2258 of whether the district court erred in awarding Guilford its attorneys' fees and costs under 42 U.S.C. § 1988. We reverse and vacate the award of attorneys' fees.

I.  Background

A.  Factual Background

Guilford has owned and operated a railroad yard in Ayer since 1974. The site serves as an unloading and temporary storage

-5-

area for automobiles brought in by rail; it has approximately two thousand parking spaces. In 1997, Guilford purchased 126 acres at the San Vel site, also within the town of Ayer, across the road from its existing railroad yard. Its intention was to create three thousand additional parking spaces on this new site for temporary automobile storage, as well as adding more unloading tracks, a building, and an access road.

The San Vel site is located within the Zone II Aquifer Protection Area. This aquifer protects the water wells at Spectacle Pond, which are the main supply for Ayer's drinking water.[4] In November 1997, Guilford began to seek approval from the town to construct the new storage facility. On May 18, 1998, it filed a "notice of intent" with the Ayer Conservation Commission. In this notice, and at a Planning Board meeting on May 26, 1999, Guilford agreed to abide by a list of conditions. It also petitioned for Site Plan Approval from the Ayer Planning Board.

The town's response was less than encouraging. On August 26, 1999, the Planning Board issued a Certificate of Approval; however, it contained thirty-six conditions. Many of these were preconditions to construction. Complicating matters further, on August 18, 1999, the Ayer Board of Health adopted new bylaws authorizing it to designate certain occupations as "noisome trades"

---

[4] The site is also within the Zone III aquifer protecting the Town of Littleton's Spectacle Pond well.

and prohibit them within town limits.  On November 17, 1999, the Board of Health declared that "an 'auto unloading facility' will be considered a noisome trade."  Thus, in addition to the thirty-six conditions, Guilford now had to contend with the possibility of being prohibited from operating its proposed facility altogether. Indeed, the Board of Health ruling threatened the operation of the existing railroad yard as well, as it also unloaded automobiles.

B.  Procedural History

1.  District Court History

On December 20, 1999, Guilford filed suit in the United States District Court for the District of Massachusetts. Guilford's complaint alleged that the STB was granted exclusive jurisdiction over the construction and operation of railroad facilities under 49 U.S.C. § 10501(b) (2000), and that the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. §§ 701-727, 10101-16105, preempted the Board of Health's designation of the new facility as a noisome trade.  It also alleged that the local permitting conditions violated the dormant Commerce Clause and thus the Supremacy Clause.  The complaint sought declaratory and injunctive relief and attorneys' fees.

In October 2000 the district court referred the matter to the STB, stating that the "expertise of the Board in evaluating the right of the defendants, if any, to regulate the plaintiffs' proposed development off Willow Road in the Town of Ayer,

-7-

Massachusetts would assist this Court in determining the rights, duties, and obligations of the parties." On May 1, 2001, the STB issued its decision. The defendants filed a petition for reconsideration on May 21, which the STB denied on October 5, 2001.[5]

And there the case largely ended. For procedural reasons, the district court itself never reached the preemption or Commerce Clause issues raised in Guilford's complaint. The STB gave its views to the district court as to whether federal law preempted some of the conditions imposed by the town. When the district court granted summary judgment for Guilford on March 20, 2002, it declined to evaluate whether some or all of the conditions were indeed preempted. Instead, it ruled for Guilford because Ayer had failed to request judicial review within ninety days of the STB's order, as required by 28 U.S.C. § 1336(c) (2000).[6] The

---

[5] While the STB was considering the petition for reconsideration, Ayer successfully sought to restrain Guilford from its ongoing activity on the site. When Guilford appealed the restriction, this court noted that the parties' agreement to maintain the status quo lasted only so long as the STB proceedings were ongoing (the court was unaware of Ayer's motion to the STB for reconsideration). By order dated July 16, 2001 this court vacated the preliminary injunction because it was not accompanied by the requisite findings, but left the parties free to broach the issues anew in the district court.

[6] The district court, for the purpose of calculating the ninety days, included the time between the STB's May 1 order and Ayer's May 21 motion for reconsideration. That approach was mistaken; if a petition for reconsideration of an administrative order is filed, the original order is not final, and the limitations period begins only when the petition for

status of the thirty-six conditions was left, to some degree, unresolved.

Guilford then moved for attorneys' fees under 42 U.S.C. § 1988. The district court allowed the motion on June 10, 2002, and on August 20 the court awarded $286,839.49.

2. STB's Holding

The analysis by the STB of federal preemption under 49 U.S.C. § 10501(b) was finely crafted. See Boston & Me. Corp., 2001 Fed. Carr. Cas. (CCH) ¶ 38,352 (May 1, 2001), available at 2001 WL 458685. Effectively, the STB said the town may not flatly ban Guilford's efforts at developing the San Vel site, as it did in its noisome trade determination, and that it may not impose pre-conditions to construction, but that it may impose reasonable and non-discriminatory environmental restrictions which do not unduly burden interstate commerce or unduly restrict the railroad from conducting its operations. The STB did not hold that all state and local regulation of Guilford's activity was preempted. It rejected Ayer's argument that the express preemption language of § 10501(b) did not apply to instances where the STB lacked licensing authority under 49 U.S.C. §§ 10901 and 10906, and it held that state and local law are preempted in those instances in limited

reconsideration is denied. See ICC v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 284 (1987). Even calculated in the correct manner, it appears that neither party timely sought review of the STB order. In any event, that aspect of the case has since been settled.

circumstances.  It held that "preclearance requirements (including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations."  The STB viewed pre-construction approval requirements as giving local authorities impermissible veto power over rail transportation issues.

Nonetheless, the STB found state and local regulation to be permissible "where it does not interfere with interstate rail operations, and localities retain certain police powers to protect public health and safety."  In its May order, the STB gave three guidelines for permissible state and local regulation:

1. Non-discriminatory enforcement of requirements such as building and electrical codes (other than pre-construction requirements) generally are not preempted.

2.  A town may seek enforcement of voluntary agreements a railroad has entered into with a town.

3. Section 10501(b) should not be interpreted as intending to interfere with the role of state and local agencies in implementing federal environmental statutes.

All local regulation, in the STB's view, is subject to the same test: whether the statute or regulation is being applied to "unduly restrict the railroad from conducting its operations, or unreasonably burden interstate commerce."  This, said the STB, was

a fact-bound question. Accordingly, the STB held that federal law preempted the noisome trade ordinance and the two town pre-construction processes -- the Planning Board permit process and the Conservation Commission's pre-construction approval process.

The STB treated the Conservation Commission's thirty-six conditions as a separate matter and offered advice to the district court as to how to evaluate each of these:

> Examples of solutions that appear to us to be reasonable include conditions requiring railroads to (1) share their plans with the community, when they are undertaking an activity for which another entity would require a permit; (2) use state or local best management practices when they construct railroad facilities; (3) implement appropriate precautionary measures at the railroad facility, so long as the measures are fairly applied; (4) provide representatives to meet periodically with citizen groups or local government entities to seek mutually acceptable ways to address local concerns; and (5) submit environmental monitoring or testing information to local government entities for an appropriate period of time after operations begin.

> Communities also can enforce their local codes for electrical, building, fire, and plumbing, unless the codes are applied in a discriminatory manner, unreasonably restrict the railroad from conducting its operations, or unnecessarily burden interstate commerce. Moreover, railroads may not deny towns access in emergencies and for reasonable inspection of the railroad facilities. And to the extent a railroad is willing to undertake an activity or restriction, the activity or restriction generally should be seen as reflecting the carrier's own determination that the condition is reasonable and will not unduly burden interstate commerce.

The STB suggested that conditions 1, 2, 3, 4, 8, 15, 16, 17, 18, 27, and 28 would likely not be preempted, that conditions 7 and 14 would likely be preempted, and that conditions 9 and 12 were

examples of areas to which Guilford could agree.  In its October order denying Ayer's petition for reconsideration, Boston & Me. Corp., STB Finance Docket No. 33971, 2001 WL 1174385 (Oct 3, 2001), the STB made clear that it had engaged in no factfinding as to any of these conditions, but merely attempted to provide general guidance to the district court.

### 3.  Settlement

On May 1, 2003, Guilford and the Town of Ayer, through CAMP, reached a settlement that resolved almost all issues in the case.  The parties agreed on a permissible list of conditions Ayer may impose on a railroad facility on the San Vel site; they also agreed that these conditions comprise the sole regulatory ability of the town.  Finally, the parties agreed to a dismissal of all of the appeals except Ayer's appeal of the district court's orders on June 10 and August 20, 2002, finding Guilford eligible for attorneys' fees and awarding fees and costs.

## II.  Discussion

The district court awarded Guilford $286,839.49 in attorneys' fees under 42 U.S.C. § 1988, on the premise that Guilford successfully vindicated its rights under § 1983.  We review the legal determinations inherent in the court's order de novo.  We note initially that it is not clear that Guilford was the "prevailing party," id. § 1988, in the district court proceedings, since the only issue resolved was the STB order and no party sought

timely judicial review of that order, see supra note 6.  However, for the purposes of this discussion we assume that Guilford meets the prevailing party requirement.

Count I of Guilford's complaint alleged Supremacy Clause violations.  A claim based solely on the Supremacy Clause does not create rights within 28 U.S.C. § 1343(a)(3) and is not cognizable under 42 U.S.C. § 1983.  Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 615 (1979); see Md. Pest Control Ass'n v. Montgomery County, 884 F.2d 160, 163 (4th Cir. 1989) (per curiam) (attorneys' fees under § 1988 not available under § 1983 on a Supremacy Clause preemption claim).  Guilford's claim for attorneys' fees thus depends on an interpretation of the ICCTA.

To the extent Guilford is a prevailing party, it is because the STB ruled largely, though not entirely, in its favor. The STB order is part of a comprehensive statutory scheme of federal regulation of the railways.  Accordingly, the STB has primary jurisdiction over aspects of railway operations and facilities.  Pejepscot Indus. Park, Inc. v. Grimmel Indus., 215 F.3d 195, 197 (1st Cir. 2000).  Indeed, Guilford's complaint asserted that the STB had primary jurisdiction over all aspects of this case.  Here, the ICCTA creates an explicit and complex statutory scheme, and § 1336 contains provisions authorizing judicial review.  None of those provisions authorizes an award of

-13-

attorneys' fees.  Had Congress wished to authorize such fees under § 1336, it could easily have done so.

The district court did not have the benefit of the Supreme Court's later decision in <u>Gonzaga University</u> v. <u>Doe</u>, 536 U.S. 273 (2002).  Acknowledging some ambiguity in its precedent, the <u>Gonzaga</u> Court further clarified when an action is cognizable under 42 U.S.C. § 1983 and held that the same analysis applied to § 1983 questions as in implied cause of action cases.  A plaintiff must assert violation of a federal right which is "unambiguously conferred."  <u>Id.</u> at 283.

Ultimately, the test is one of congressional intent. <u>Bryson</u> v. <u>Shumway</u>, 308 F.3d 79, 88-89 (1st Cir. 2002).  This case is not one in which a statute seems to benefit a class, where the question would be whether Congress meant to create rights which are judicially enforceable under § 1983.  <u>Id.</u>  Here, Congress has not been silent.  It has made clear in ICCTA where primary jurisdiction lies, and it has created an explicit scheme for judicial review of STB orders and remedies.  That scheme does not include awards of attorneys' fees.  Indeed, § 1336(a) authorizes injunctive and declaratory relief but has no provisions for attorneys' fees; it would be more than odd to create an action under § 1983 solely to provide for attorneys' fees.  It would be contrary to Congressional intent to create a § 1983 action here.

Of course, the mere existence of a statutory enforcement scheme does not always preclude the creation of remedies under 42 U.S.C. § 1983. See Golden State Transit Corp. v. City of L.A., 493 U.S. 103, 106 (1989) ("The availability of administrative mechanisms to protect the plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy."). But nothing suggests that Congress intended to create rights for railroads apart from the STB statutory scheme. Even the "rights" cited by Guilford are less than clear and definitive. Guilford does not have the right to be free of all local environmental regulation; the STB order makes that pellucid. Moreover, the district court's judgment was entered based on the STB order under § 1336, not under the Commerce Clause.

In the end, Guilford's argument devolves to the assertion that the town should not have attempted to enforce its own environmental regulations, but should have ceded all authority to the STB, and that Congress created a right, enforceable under § 1983, to sue the town and recover attorneys' fees for the town's error in judgment over jurisdiction. Given that the town does have environmental responsibilities under federal law, we are convinced Congress did not intend this to be a situation where a separate cause of action is created under § 1983.

The award of attorneys' fees is **reversed** and **vacated**. The joint motion regarding partial settlement is **allowed**. Each side shall bear its own costs.