*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0437P (6th Cir.)
File Name: 03a0437p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
    *Plaintiff-Appellant,*

    *v.*

No. 02-5185

JOHN LATON,
    *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 01-20235—Robert H. Cleland, District Judge.

Argued: August 1, 2003

Decided and Filed: December 10, 2003

Before: DAUGHTREY, MOORE, and SUTTON, Circuit
Judges.

———————

### COUNSEL

**ARGUED:** Jennifer L. Webber, ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellant.
Leslie I. Ballin, BALLIN, BALLIN & FISHMAN, Memphis,
Tennessee, for Appellee. **ON BRIEF:** Jennifer L. Webber,
ASSISTANT UNITED STATES ATTORNEY, Memphis,

Tennessee, for Appellant. Leslie I. Ballin, BALLIN,
BALLIN & FISHMAN, Memphis, Tennessee, for Appellee.

    MOORE, J., delivered the opinion of the court, in which
DAUGHTREY, J., joined. SUTTON, J. (pp. 27-48),
delivered a separate dissenting opinion.

———————

### OPINION

———————

    KAREN NELSON MOORE, Circuit Judge. Local and
state government institutions provide a wide variety of
services ranging from transportation to economic
development, which can produce ripples in the broader stream
of interstate commerce to varying degrees. The general
question presented by the relatively bizarre factual
background of this case is whether or not a core function of
municipal government — the provision of firefighting
services — impacts interstate commerce such that an
individual can be indicted under a federal anti-arson statute
for destroying a fire station. The more precise question, upon
which we dwell, is whether the Henning, Tennessee Fire
Station was used in an activity affecting interstate commerce
such that the person charged with setting it ablaze can be
indicted under 18 U.S.C. § 844(i). We hold that this
particular fire station was used in an activity affecting
interstate commerce and accordingly **REVERSE** the
judgment of the district court dismissing the indictment and
**REMAND** for further proceedings consistent with this
opinion.

### I. BACKGROUND FACTS AND PROCEDURE

    Prometheus may have thought twice before handing down
the gift of fire to humans had he imagined that those whom
the mere mortals chose to steward the precious flame would
use it to decimate the very mechanisms employed to control

its power. We are faced with precisely such an odd event. On March 3, 2000, the Henning Fire Station ("HFS") was destroyed by fire. Henning is a rural town in the western Tennessee county of Lauderdale. It lies between Memphis and Dyersburg on U.S. Route 51 and is approximately twenty miles from the Mississippi River. On September 18, 2001, a federal grand jury indicted John Laton ("Laton"), the chief of the Henning Fire Department ("HFD"), on one count of arson in violation of 18 U.S.C. § 844(i), the federal anti-arson statute.

Laton subsequently moved to dismiss the indictment in October 2001, contending that the district court lacked subject matter jurisdiction over the prosecution because the HFS was not used in an activity affecting interstate commerce. Both parties agreed upon and submitted to the court a set of stipulations, which established the relevant facts regarding the HFS and the HFD. First, the HFS housed firefighting equipment, including fire trucks, nozzles, uniforms, hoses, and other equipment. Additionally, the HFS contained an office, a kitchen, and meeting spaces for members of the HFD. Second, the HFD purchased most of its firefighting equipment from out-of-state vendors, and the HFD in the past relied upon out-of-state vendors for repairs to this equipment. Third, the HFD is responsible for responding to fire emergencies in Henning, which, like any other town, contains residences, churches, public buildings, and businesses. In the past, the HFD has responded to various emergency calls involving several businesses in Henning, including a market and a laundry facility, the Henning Police Department, and vehicles in distress on U.S. Route 51 and at the U.S. Route 51 rest area. Fourth, when the HFD responds to fire calls outside of the Henning city limits, the HFD charges out-of-state insurance companies $500. Fifth, the volunteer firefighters who compose the HFD are paid wages by the City of Henning based upon the amount of time that they spend at a fire scene. The total wages paid to the firefighters generally does not exceed $1,000 per year. Sixth, the firefighting presence of the HFS and the HFD impacts insurance rates in Henning.

Virtually all American insurance companies use the Public Protection Classification ("PPC") to calculate fire-insurance premiums in a particular area. The PPC is partially based upon the equipment, staffing, training, and geographic distribution of local fire departments. Fire insurance premiums in a community with a "good" PPC are considerably lower than in a community with a "bad" PPC, and insureds in an area that lacks fire services altogether will have the "worst" PPC and the highest premiums.

The district court granted Laton's motion to dismiss on the ground that the HFS was not used in interstate commerce. *United States v. Laton*, 180 F. Supp. 2d 948 (W.D. Tenn. 2002). It focused its analysis on "whether the [HFS] was used in the activities of the [HFD], and whether those activities substantially affect interstate commerce." *Id.* at 952. The court thus bifurcated the purposes of the HFS and the HFD, reasoning that it was "not significant that the [HFS] houses the trucks that drive to sites" of fires involving business or other instrumentalities of interstate commerce because "[t]his is too attenuated a series of connections to constitute a building that is used 'in any activity'" that affects interstate commerce. *Id.* The district judge then ruled that the purchase of supplies from out of state, the payment of some wages to the firefighters, the fees billed for out-of-city fires, and the impact upon insurance rates did "not indicate any sort of active employment, but is again evidence of, at the very least, a passive connection." *Id.* at 953. Accordingly, the court dismissed the indictment, because it ruled that it lacked subject matter jurisdiction over the case. *Id.*

The government timely appealed the district court's ruling. We have jurisdiction to hear such an appeal pursuant to 18 U.S.C. § 3731. *See id.* ("In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment . . . ."). On review, we reject the reasoning of the district court, reverse its judgment dismissing the indictment,

and remand for further proceedings consistent with this opinion.

## II. ANALYSIS

### A. Erroneous Dismissal for Lack of Subject Matter Jurisdiction

As a preliminary matter, we hold that the district court erred in dismissing the indictment based on the conclusion that it lacked subject matter jurisdiction. In *United States v. Rayborn*, 312 F.3d 229 (6th Cir. 2002), which we decided after the district court's decision in this case, we held that the interstate-commerce requirement "is simply one of the essential elements of § 844(i)," even though it is frequently denoted a "'jurisdictional element.'" *Id.* at 231. We explained that "[i]t is not jurisdictional in the sense that it affects a court's subject matter jurisdiction, *i.e.*, a court's constitutional or statutory power to adjudicate a case." *Id.* The district court here, just like the district court in *Rayborn*, did have subject matter jurisdiction over the indictment under 18 U.S.C. § 3231.

This does not end the appeal. We noted in *Rayborn* that "this court typically vacates a dismissal order when it determines that a district court has erred in dismissing a case for lack of subject matter jurisdiction . . . ." *Rayborn*, 312 F.3d at 232. Yet, *Rayborn* also instructs that when the district court "undertook an evaluation of the merits of the interstate commerce question under the guise of subject matter jurisdiction," *id.*, we are permitted to determine whether the evidence produced by the government (or in this case stipulated to by both parties) is sufficient to permit a rational jury to find that a particular building was used in an activity that affected interstate commerce such that the indictment can still stand. *Id.* at 235-36; *see also United States v. Latouf*, 132 F.3d 320, 325-26 (6th Cir. 1997) ("The relevant inquiry when reviewing claims of insufficient evidence is whether after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (internal quotations omitted)).

We follow *Rayborn*'s lead and review the merits of the district court's determination that the HFS was not used in an activity that affected interstate commerce. Because the inquiry into whether the HFS affects interstate commerce is a mixed question of fact and law, we review the district court's determination de novo. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 523 U.S. 1122 (1998).

### B. Section 844(i) and Its Applicability to Government Buildings and Property

We start with the plain language of the statute. Section 844(i) provides: "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce *or in any activity affecting interstate or foreign commerce* shall be imprisoned for not less than 5 years and not more than 20 years . . . ." 18 U.S.C. § 844(i) (emphasis added).[1] The statute thus covers the arson of any building that is either used in interstate commerce or that is used in any activity affecting interstate commerce.[2]

Crimes of arson have traditionally been viewed as "paradigmatic common-law state crime[s]," but in 1982 Congress chose to federalize certain arson crimes as an exercise of its Commerce Clause power. *Jones v. United*

---

[1] "Interstate commerce" is defined as "commerce between any place in a State and any place outside of that State." 18 U.S.C. § 841(b).

[2] Affect is "[t]o act upon; influence; change; enlarge or abridge; . . . to act, or produce an effect or result upon; to impress or influence . . . ." BLACK'S LAW DICTIONARY 57 (6th ed. 1991).

*States*, 529 U.S. 848, 858 (2000).[3]  In seeking to avoid "render[ing] traditionally local criminal conduct a matter for federal enforcement," Congress "will not be deemed to have significantly changed the federal-state balance" unless it clearly conveys its purpose. *United States v. Bass*, 404 U.S. 336, 349-50 (1971) (quoted in *Jones*, 529 U.S. at 858).[4] Additionally, when Congress fails to speak in clear and definite language, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Jones*, 529 U.S. at 858 (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)).  Had Congress been ambiguous in its formulation of § 844(i), the rule of lenity might apply, but

---

[3] Congress originally passed § 844(i) as part of the Organized Crime Control Act of 1970 to control the use and possession of explosives. *See Russell v. United States*, 471 U.S. 858, 860 n.5 (1985). In 1982, Congress amended the statute to include the words "fire or" before the words "an explosive." *Jones v. United States*, 529 U.S. 848, 853 n.4 (2000).

[4] We note that the federal prosecution of Laton does not preclude the state from also prosecuting him if it so desires. *See Heath v. Alabama*, 474 U.S. 82, 89-90 (1985) ("'[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.'" (quoting *United States v. Lanza*, 260 U.S. 377, 382 (1922)). Under the federal arson statute, Laton faces a sentence of five to twenty years, assuming that no persons were injured by the fire. 18 U.S.C. § 844(i). If any persons were injured, Laton faces a sentence of seven to forty years, and if any persons were killed by the fire, Laton is subject to any term of imprisonment, including life imprisonment. *Id.* Under the Tennessee arson statute, the destruction of a building by fire is a Class C felony, which is punishable by a term of imprisonment of three to fifteen years. *See* Tenn. Code Ann. §§ 39-14-301, 40-35-111(b)(3). If any persons were injured in the fire, the arson of the HFS would constitute a Class A felony, which is punishable by a term of imprisonment of fifteen to sixty years. *See* Tenn. Code Ann. §§ 39-14-302, 40-35-111(b)(1). Any supposed friction, as the dissent labels it, between the policy choices of the United States Congress and the Tennessee Legislature regarding the severity of the criminal sanction is a necessary by-product of a federalist republic; a disparity between state and federal sentences, which in this instance is de minimis, occurs quite often in areas of concurrent jurisdiction, such as prosecution for drug-related offenses.

counter to the dissent's belief that § 844(i) suffers from a lack of clarity, Congress made transparent its objective in passing § 844(i).  It fashioned a statute that covered the arson of "any" building and included a jurisdictional element limiting its reach to buildings that are used in interstate commerce or in any activity affecting interstate commerce, such that § 844(i) was "intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Russell v. United States*, 471 U.S. 858, 862 (1985).

We are mindful of our duty to construe a statute so as to eschew constitutional questions, and the straightforward application of the jurisdictional element here aids us in avoiding any such entanglements. The prominent issue raised by this appeal is not constitutional in scope, rather it is an exercise in statutory interpretation. In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court remarked that the Gun-Free School Zones Act of 1990 (formerly 18 U.S.C. § 922(q)) "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question *affects* interstate commerce." *Id.* at 562 (emphasis added).  It distinguished § 922(q) from the former 18 U.S.C. § 1202(a), a statute examined in *United States v. Bass*, 404 U.S. 336 (1971), "which made it a crime for a felon to 'receive, posses[s], or transport in commerce *or affecting* commerce . . . any firearm,'" *Lopez*, 514 U.S at 561-62 (emphasis added) (quoting *Bass*, 404 U.S. at 337).  The Court wrote that "[u]nlike the statute in *Bass*, § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at 562.  Unlike § 922(q), § 844(i) does contain a jurisdictional element, and we accordingly follow the lead of previous post-*Lopez* decisions, which focus on interpreting the words of similarly phrased jurisdictional elements.  *See Rayborn*, 312 F.3d at 232-33 (applying *Jones*'s two-part test to determine that the jurisdictional element in § 844(i) was satisfied and the prosecution could proceed); *United States v.*

*Riddle*, 249 F.3d 529, 536 (6th Cir. 2001) (RICO provision,18 U.S.C. § 1962(c); *United States v. Napier*, 233 F.3d 394, 400 (6th Cir. 2000) (firearms provision governing those under domestic-violence court orders, 18 U.S.C. § 922(g)(8)); *United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999) (Hobbs Act, 18 U.S.C. § 1951); *United States v. Ables*, 167 F.3d 1021, 1030 (6th Cir. 1999) (money laundering provision, 18 U.S.C. § 1956); *United States v. Chesney*, 86 F.3d 564, 568-70 (6th Cir. 1996) (firearms provision governing convicted felons, 18 U.S.C. § 922(g)(1)). Our responsibility is to decide whether the government can demonstrate that the HFS was used in commerce or in an activity affecting commerce such that any rational juror could find that the jurisdictional element of the crime defined in the statute has been satisfied beyond a reasonable doubt.

On its face, § 844(i) does not distinguish between the arson of traditional for-profit business property, nonprofit organizations' structures and equipment, or state and local government buildings and supplies,[5] because the statute simply governs "any building, vehicle, or other real or personal property." 18 U.S.C. § 844(i). There can be little doubt that virtually all edifices and personal property employed by for-profit businesses are both used in interstate commerce and used in activities that affect interstate commerce, as they primarily house and make possible the operation of businesses that buy, sell, manufacture, ship, and finance goods and services. Nonprofit institutions can also impact interstate commerce. The mere fact that a nonprofit organization differs from its for-profit cousins in its treatment of net earnings does not prevent its buildings or property from being used in interstate commerce or in an activity affecting interstate commerce. As the Supreme Court has explained, "[n]othing intrinsic to the nature of nonprofit entities prevents

---

[5]We use "local" to encompass all political entities within but not including a state, such as municipalities, counties, and special districts (water, school, economic development, etc.).

them from engaging in interstate commerce," particularly because "they purchase goods and services in competitive markets, offer their facilities to a variety of patrons, and derive revenues from a variety of sources, some of which are local and some out of State." *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U.S. 564, 585-86 (1997). Thus, as the Court stated, "[f]or purposes of Commerce Clause analysis, any categorical distinction between the activities of profit-making enterprises and not-for-profit entities is . . . wholly illusory." *Id.* at 586.

Similarly, government institutions not only can affect interstate commerce but also can be direct participants in interstate commerce. The Supreme Court has noted on several occasions the impact that certain federal, state, and local government institutions can have on interstate commerce. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 537, 547-48 (1985) (holding that application of Fair Labor Standards Act ("FLSA") to transportation employees employed by local government does not contravene the Commerce Clause because labor conditions of those employees affect interstate commerce).[6] Governments in general, and individual government institutions in particular, can serve in both a sovereign/regulatory capacity and a market capacity, and their actions as either can affect interstate commerce. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (holding that a municipal transit vehicle is not a public forum for First Amendment purposes because "the city is engaged in commerce" and the advertising space in question "although incidental to the

---

[6]The Court also rejected "as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.'" *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546-47 (1985). The Court highlighted "the elusiveness of objective criteria for 'fundamental' elements of state sovereignty," labeling such obliqueness as "a problem we have witnessed in the search for 'traditional governmental functions.'" *Id.* at 548.

provision of public transportation, is part of a commercial venture"); *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (concluding that federal government acts as proprietor, and not as regulator, for First Amendment purposes when it operates the United States Post Office); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (ruling that local government acts as a proprietor when it owns and operates an airport).

In their operations as a sovereign or as a regulator, governments may engage in interstate commerce or in activities that affect interstate commerce, even though the impetus for their actions is noncommercial because it is motivated by public service. *See Garcia*, 469 U.S. at 539 ("The constitutional distinction between licensing drivers and regulating traffic . . . or between operating a highway authority and operating a mental health facility, is elusive at best."); *United States v. Terry*, 257 F.3d 366, 369 (4th Cir. 2001) ("We cannot close our eyes to the commercial nature of an activity solely because non-commercial considerations also underlie it."). In their function as market participants, governments inherently influence interstate commerce. *See White v. Mass. Council of Constr. Employers, Inc.*, 460 U.S. 204, 207, 214 (1983) (ruling that when a city government expends its own funds for construction of public projects, it can promote the employment of its own citizens, because it acts as "a market participant" and "there is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market" (quotation omitted)); *Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 912 (8th Cir. 1997) (defining a local airport commission, which operated the airport and charged concession fees from various vendors, as a market participant); *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1301 (3d Cir. 1996) ("It is beyond dispute that state lotteries affect interstate commerce.") (quoting *The Lottery Case*, 188 U.S. 321, 354 (1903) ("[L]ottery tickets . . . are subjects of commerce.")).

The reality that the core functions of government are not exclusive of interstate commerce does not only hold true when a government operates a commercial enterprise, such as a post office, lottery, or liquor store. Government institutions also can affect interstate commerce when they provide core public services, such as police protection and emergency services.[7] *See Prickett v. DeKalb County*, 92 F. Supp. 2d 1357, 1362-63 (N.D. Ga. 2000) (determining that labor practices of county fire department impact interstate commerce such that the FLSA applies to its employees); *Persons v. City of Gresham*, 704 F. Supp. 191, 193 (D. Ore. 1988) (applying FLSA to municipal firefighters because the fire department responded to emergencies that involved instrumentalities of interstate commerce and protected businesses engaged in interstate commerce); *Conway v. Takoma Park Volunteer Fire Dep't*, 666 F. Supp. 786, 791 (D. Md. 1987) (same). One can imagine dozens of state and local government institutions that could be used in activities affecting interstate commerce, including but not limited to airports, seaports, convention centers, police departments auctioning off seized and forfeited property, health care centers, and departments of property management, economic development, and waste collection. Accordingly, Section § 844(i) has been invoked in the past to prosecute the arson of public buildings; for example, the Tenth Circuit affirmed the conviction under § 844(i) of the arsonist of a City Hall. *United States v. Woodward*, No. 93-3123, 1993 WL 498178 (10th Cir. Dec. 2, 1993) (unpublished). The police

---

[7]Counter to the dissent's assertion, the fact that city-funded firefighting constitutes an unbargained-for public service is not relevant to the analysis. That individual citizens do not explicitly contract for firefighting support does not mean that fire stations and fire departments fail to impact interstate commerce. Individuals do not bargain with non-profit organizations in order to receive charity or other forms of assistance, yet the Supreme Court has made clear that any rigid categorization of non-profits as entities incapable of affecting interstate commerce is void. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 586 (1997).

department is not used in an activity affecting interstate commerce simply because it sells "I Support My Local Police Department" stickers, but to believe that such fundraising sales are the only way that a police building can be used in activities affecting interstate commerce naively ignores a police department's role as reclaimer of stolen property moving between states, auctioneer of seized goods, and perpetuator of the safety necessary to encourage interstate business growth.

The link between government and commerce described above merely establishes that state and local government buildings and property are neither inherently disconnected from nor innately intertwined with interstate commerce. Each piece of real or personal property, taking into account its function, must be assessed individually to determine the extent to which it impacts interstate commerce. There can be no uniform and inflexible rule that §844(i) covers either all or none of the wide variety of municipal buildings that fill either the largest urban metropolis or the smallest rural hamlet. This perfectly conforms to Congress's will as expressed in § 844(i); the insertion of a jurisdictional element mandates a case-by-case, building-by-building inquiry into whether that particular building is used in an activity that affects interstate commerce, no matter whether it is owned and operated by a supermarket, an advocacy group, or a local-government police department.

## C. The Supreme Court's Analysis of 18 U.S.C. § 844(i)

The Supreme Court has had two opportunities to analyze 18 U.S.C. § 844(i) and to establish a mechanism by which courts can assess whether real or personal property is used in interstate commerce or in an activity that affects interstate commerce. In *Russell v. United States*, 471 U.S. 858 (1985), the Court considered whether the arson of a two-unit apartment building that was used as a rental property fell within the purview of 18 U.S.C. § 844(i). The Court held that "the statute only applies to property that is 'used' in an

'activity' that affects commerce" and reasoned that "[t]he rental of real estate is unquestionably such an activity." *Id.* at 862. In its analysis, the Court noted that the original version of the bill proposing § 844(i) contained the words "for business purposes," but that Congress removed such language before enactment "after considering whether the bill as originally introduced would cover bombings of police stations or churches . . . ." *Id.* at 860; *see also id.* at 860-61 nn.5-9 (quoting the relevant legislative history).[8] The Court read this legislative history to suggest "that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Id.* at 862.[9] Because the apartments in

---

[8] Enacted as part of the "Explosive Control Act" provisions of the Organized Crime Control Act of 1970, 84 Stat. 922, 952, the precursor to § 844(i) provided stiff penalties for "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used *for business purposes* by a person engaged in commerce or in any activity affecting commerce . . . ." H.R. 16699, 91st Cong., 2d Sess. (1970) (emphasis added). During a hearing on this provision, several representatives expressed concern that the statute as worded would not cover the bombing of police stations or churches and suggested leaving out the words "for business purposes." *Russell*, 471 U.S. at 860-61 nn.6-7. This phrase was not included in the statute as enacted.

[9] The dissent suggests that a glance at § 844(i)'s code-book neighbor, 18 U.S.C. § 844(f) definitively reveals that Congress did not intend for § 844(i) to reach all government buildings even though § 844(f) governs only the destruction of federal, but not state or local, buildings. Section 844(f)(1) reads: "Whoever maliciously damages or destroys . . . by means of fire . . . any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned . . . ." This provision criminalizes the arson of any federal building, such as the former Murrah Federal Building in Oklahoma City, or any building owned by an organization obtaining federal assistance, such as a university research laboratory that receives a federal grant and then markets its technology. The two statutes do not reference each other, although they were passed at the same time in response to the spate of

the building were rented to tenants at the time of the fire, the Court concluded that the property was "being used in an activity affecting interstate commerce." *Id.*; *see also United States v. Ryan*, 9 F.3d 660, 667 (8th Cir. 1994) (ruling that a closed fitness center affected interstate commerce because the building was owned and leased by an individual from a different state).

The question that *Russell* hinted at — whether or not § 844(i) reached the destruction of a private residence — remained unresolved until 2000. In *Jones v. United States*, 529 U.S. 848 (2000), the Supreme Court ruled that "§ 844(i) does not reach an owner-occupied residence that is not used

---

bombings in the late 1960s. *See United States v. Eichman*, 957 F.2d 45, 46 (2d Cir. 1992) (describing § 844(f)'s history). One cannot logically conclude that the specific mention of federal government buildings in § 844(f) provides definitive evidence of Congress's intention to draw § 844(i)'s boundaries just shy of reaching state or local government buildings.

The provisions overlap in some respects, but they are not so complimentary that the existence of one negates the purpose of the other. For the arson of the university lab mentioned above, both § 844(i) and § 844(f) apply. However, the two statutes will not always be interchangeable such that § 844(i) is surplusage. The arson of a building owned by the federal government or an entity receiving federal assistance that does not in any way affect interstate commerce cannot be prosecuted under § 844(i), but can be under § 844(f). For example, if an individual purchased a single-family residence under a federal program in which the cost of the home was split between the buyer and a state-run housing organization receiving federal funds such that the state government owned part of the residence, the arson of that residence would be punishable under § 844(f), but not § 844(i). *Cf. United States v. Davis*, 98 F.3d 141, 145 (4th Cir. 1996) (affirming prosecution under § 844(f) for the arson of a single-family townhouse because a state housing authority that received federal assistance heavily subsidized the rent of the tenant). Similarly, the arson of a non-federal building, the owners or possessors of which do not receive federal funds, cannot be prosecuted under § 844(f), but may be under § 844(i) if the building was used in an activity affecting interstate commerce. Thus, there are certain arsons that may be prosecuted under § 844(f), but not § 844(i), and others that may be prosecuted under § 844(i), but not § 844(f). Each section has a special function to serve.

for any commercial purpose." *Id.* at 852. Justice Ginsburg, writing for a unanimous Court, again noted how Congress removed the "for business purposes" language from the proposed bill in order to indicate "that . . . the provision should apply to the bombings of schools, police stations, and places of worship." *Id.* at 853 n.5 (citing *Russell*, 471 U.S. at 860-61).[10] The Court emphasized the "qualifying words 'used in,'" which mandates "'that the damaged or destroyed property must itself have been used in commerce *or* in an activity affecting commerce.'" *Jones*, 529 U.S. at 854 (emphasis added) (quoting *United States v. Mennuti*, 639 F.2d 107, 110 (2d Cir. 1981)). It then outlined a two-part inquiry for assessing the applicability of § 844(i), which entailed an analysis of "'the function of the building itself, and then a determination of whether that function affects interstate

---

[10]The Supreme Court has thus twice relied on this legislative history in analyzing § 844(i). Even if this legislative history did not exist, it would not alter our conclusion because it is the plain language of the statute that directs us towards the inquiry of whether the fire station is used in an activity that affects interstate commerce. However, we need not ignore the history of § 844(i). We agree with the dissent that we are not to "attach decisive significance to the *unexplained* disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent." *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) (emphasis added) (quoting *Trailmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947)). We also recognize that "unenacted approvals, beliefs, and desires are not laws." *Puerto Rico Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 501 (1988). However, the disappearance of the words "for business purposes" from the proposed, but unenacted, version of the original § 844(i) in 1970 was neither unexplained nor mute. Congress explained that it removed the words to ensure that § 844(i) covered more than just traditional business properties, although precisely how much more is the question we address today. Furthermore, the belief or desire that § 844(i) cover "any" type of building used in interstate commerce could not be described as unenacted. In contrast to the words "for business purposes," which were not included in the final bill, § 844(i)'s coverage of "*any* building . . . used . . . in *any* activity affecting interstate . . . commerce" (emphasis added), reflects the desires of Congress to broaden the scope of the anti-arson statute to encompass some public institutions, such as police stations.

commerce.'" *Jones*, 529 U.S. at 854-55 (quoting *United States v. Ryan*, 9 F.3d 660, 675 (8th Cir. 1993) (Arnold, C.J., concurring in part and dissenting in part)). In exploring whether § 844(i) covered the destruction of a private residence, the court reasoned that for a building to be used in an activity affecting interstate commerce requires "active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Jones*, 529 U.S. at 855. The Court ultimately ruled that a private residence does not fit within § 844(i) where its only relationship to interstate commerce is the receipt of natural gas, a mortgage, or an insurance policy because such a limited nexus did not constitute "active employment." To hold otherwise would mean that "hardly a building in the land would fall outside the federal statute's domain" because "[p]ractically every building . . . is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce." *Id.* at 857.

This two-part inquiry must be conducted in every federal arson case to determine whether the jurisdictional element of § 844(i) has been met. This case-by-case analysis is mandated by Congress's inclusion of a jurisdictional element, which, as mentioned previously, distinguishes § 844(i) from the Gun-Free School Zones Act of 1990 that the Supreme Court struck down in *Lopez*. *See Lopez*, 514 U.S. at 562 ("[Section] 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that . . . have an explicit connection with or effect on interstate commerce."). The evidence of Congress's intention to permit federal prosecution of arson of police stations strongly implies that arson of fire stations is also covered, because police stations and fire stations provide similar public safety services. Naturally, Congress's envisioning of § 844(i) prosecutions for the arson of schools, police stations, and churches does not mean that the arson of *all* such institutions is covered by the statute, but rather only

those that are used in an activity that affects interstate commerce.

## D.  The Application of *Jones* to Laton's Indictment

We now turn to the application of *Jones*'s two-part analysis to the destruction of the HFS.[11] The first step is to identify the function of the HFS and the equipment that the building housed. A building and the personal property within that building can have multiple functions. *See Jones*, 529 U.S. at 856 (distinguishing the private home at issue from a residence that was also used as a home office or for a commercial enterprise). Accordingly, a "building's function is not limited to its primary use." *Rayborn*, 312 F.3d at 233. Churches, for example, primarily serve a religious function, but churches can also have secondary and important economic purposes. *Terry*, 257 F.3d at 369 (holding that a church "can have both a religious aspect and an economic one" when the church operated a daycare center); *United States v. Grassie*, 237 F.3d 1199, 1209-10 (10th Cir. 2001) (acknowledging that a church's activities can be both religious and commercial); *United States v. Odom*, 252 F.3d 1289, 1294 (11th Cir. 2001) ("Churches are not commonly considered a business enterprise; nonetheless, churches can and do engage in commerce.").

Similarly, the HFS performed one ancillary function and one main function. It fulfilled an ancillary function of assuring the homeowners and businesses of Henning that their property was safe. The HFS was a municipally owned building that stood alongside the police department and the city hall as a public institution and a visible public safety shield for the citizens of Henning. More significantly, the

---

[11]The complicity of the Henning Fire Chief in the arson of the HFS does not factor into the analysis. The application of § 844(i) does not turn on the identity of the arsonist. It is a bitterly ironic twist that an official employed by the local government, in fact *the* official in charge of fire safety, destroyed the firehouse, but it is not legally pertinent.

HFS made the HFD possible; fire departments cannot exist without fire stations. The HFS facilitated the provision of fire protection services necessary for the economic development and prosperity of Henning because the station and the equipment in the building provided the HFD with the implements necessary to combat fires. The function of the building and the trucks, hoses, boots, hats, and communication devices was to permit the HFD to battle ably any conflagration within the jurisdiction of the HFD, whether it be a small brush fire or a major truck or automobile accident on U.S. Route 51.

We reject the district court's conclusion that the functions of the HFS can be separated from the functions of the HFD, such that the HFD's firefighting efforts affected interstate commerce, but the HFS, an edifice containing firefighting equipment, did not. The district court wrote that "most of the facts to which the parties stipulate involve the purposes of the Henning Fire Department, not the Henning Fire Station" and ruled that "[i]t is not significant that the Henning Fire Station houses the trucks that drive to the sites that require service, even though those sites are sometimes businesses that are involved in activities that themselves affect interstate commerce." *Laton*, 180 F. Supp. 2d at 951-52. This analysis too finely atomizes the roles of the HFS and the HFD and ignores the inseparability of their functions. Neither the HFD nor any other fire department in the country can operate without trucks, hoses, axes, flashlights, fire-retardant uniforms, meeting spaces, and communication systems. To hold that the HFD could affect interstate commerce by putting out fires at businesses in Henning or along U.S. Route 51, but that the HFS could not because it only houses the trucks that combat those fires, is no less erroneous than the conclusion that a garage housing a towing service does not affect interstate commerce because the tow trucks perform their commercial function on the road or the conclusion that a radio studio does not affect interstate commerce because the intangible radio waves emanated from the studio are diffusely captured by listeners. One could fracture nearly any

traditional for-profit business, particularly in the service sector, into a building that does not in *itself* affect interstate commerce and a service performed elsewhere that most certainly does affect interstate commerce, but such division only obfuscates the true impact of the business as a whole.

The second step of the *Jones* analysis involves determining whether the function of the HFS affects interstate commerce. We must analyze whether the HFS, in its role as a municipal building that enables firefighting, is "used" in an activity that affects interstate commerce: does it enjoy "active employment for commercial purposes" rather than "a passive, passing, or past connection to commerce"? *Jones*, 529 U.S. at 855. A single relationship to interstate commerce or the conjunction of several different ties to interstate commercial activity can support a finding that a building was actively employed in commerce. For example, in *Rayborn* we affirmed a conviction under § 844(i) for the arson of a church. *Rayborn*, 312 F.3d at 234. The church broadcasted radio messages by renting out time from various stations in order to increase the attendance and contributions of out-of-state parishioners, it drew members from three states, it paid salaries, it hosted gospel concerts featuring out-of-state talent for which it requested donations, and it owned several vehicles. *Id.* at 234-35. On this basis, we concluded that "[t]he church's interstate connections were direct, regular, and substantial." *Id.* at 234. Other courts have similarly found churches to affect interstate commerce where the church has some active commercial connection. *See United States v. Terry*, 257 F.3d 366, 369-70 (4th Cir. 2001) (finding that a church daycare center "was actively engaged in commercial activity" because it provided childcare services for payment); *United States v. Grassie*, 237 F.3d 1199, 1209 n.7 (10th Cir. 2001) (holding that a Mormon church in rural New Mexico affected interstate commerce because the revenues of the church and the tithed incomes, goods, and services of church

members flowed across state lines for distribution by the church's headquarters in Salt Lake City).[12]

Churches are not the only buildings that we and other courts have found to be used in an activity affecting interstate commerce. In *United States v. Sherlin*, 67 F.3d 1208, 1213 (6th Cir. 1995), we held that the arson of a dormitory at a private college was punishable under § 844(i). The college was a nonprofit institution, but its dormitory was used in an activity that affected interstate commerce because the college received payments from students in return for educational services, it advertised out of state, and almost all of the students living in the destroyed dorm hailed from other states. *Id.* In *Bellflower v. United States*, 129 F.3d 1459, 1462 (11th Cir. 1997), the Eleventh Circuit held that § 844(i) covered the bombing of a police vehicle, which a local sheriff's deputy used in his law enforcement responsibilities. That court held

---

[12] Several courts have ruled that § 844(i) does not cover churches where the connection to interstate commerce is limited to purchasing supplies, sending dues and contributions across state lines, acquiring insurance, or providing services and religious education. *See United States v. Lamont*, 330 F.3d 1249, 1256-57 (9th Cir. 2003) (rejecting government's contention that § 844(i) applied where church purchased gas, insurance, and supplies from out of state and several church attendees came from out of state); *United States v. Rea*, 300 F.3d 952, 962 (8th Cir. 2002) (concluding that § 844(i) did not cover a church annex that only housed Sunday school classes and after-school tutoring because the purchase of supplies for the annex by itself had only "fleeting effects on interstate commerce"); *United States v. Odom*, 252 F.3d 1289, 1296-97 (11th Cir. 2001) (dismissing church's receipt of donations from out-of-state donors, utilization of Bibles purchased from out-of-state vendors, and contributions to various out-of-state nonprofit organizations as "too passive, too minimal and too indirect" to affect interstate commerce); *United States v. Johnson*, 246 F.3d 749, 752 (5th Cir. 2001) (holding that earlier decision, *United States v. Johnson*, 194 F.3d 657, 662 (5th Cir. 1999), which was vacated and remanded by the Supreme Court, 530 U.S. 1201 (2000), correctly concluded that contribution of funds by church members to a national organization and payment of an insurance claim by an out-of-state insurer did not suffice to show that the jurisdictional element of § 844(i) had been met).

that the destruction of the police car had "a significant impact on interstate commerce" because the deputy patrolled traffic and made arrests on an interstate highway, issued citations to out-of-state drivers, participated in interstate narcotic investigations, assisted out-of-state authorities in apprehending suspects, recovered stolen property from other states, and attended law enforcement training sessions in other states. *Id.*

The Supreme Court's decision in *Jones* made clear that the mere receipt of inputs or services from an out-of-state vendor is not a sufficient connection to interstate commerce to support an indictment under § 844(i). *Jones*, 529 U.S. at 856. Accordingly, a purely private residence, which is only connected to interstate commerce through the material used to construct it, the supplies used to heat it, or the monetary instrument used to finance its purchase, is not used in an activity affecting interstate commerce. However, when the government relies on other connections to interstate commerce to establish the jurisdictional element of § 844(i), the purchase of supplies from out of state can offer additional support for the conclusion that a building or property is used in an activity affecting interstate commerce. *See Rayborn*, 312 F.3d at 234-35 (mentioning, in addition to other factors, that a church affected interstate commerce because it purchased local goods, such as groceries and flowers); *Sherlin*, 67 F.3d at 1214 (noting that a college dorm affected interstate commerce partially because it purchased "numerous supplies" from out of state, including food services).

When it crafted § 844(i) to encompass the arson of police stations, Congress recognized that the provision of emergency services by municipalities can affect interstate commerce in the active sense of the phrase. *See Jones*, 529 U.S. at 853 n.5; *Russell*, 471 U.S. at 860-61. Fire stations provide similar emergency services and undoubtedly can affect interstate commerce. *See Benson v. Universal Ambulance Serv.*, 675 F.2d 783, 786 (6th Cir. 1982) (affirming lower court's determination that the FLSA applies to private ambulance

employees because responding to emergencies on streets and highways affects interstate commerce given that it removes obstructions to the free flow of interstate commerce); *Bellflower*, 129 F.3d at 1462 (upholding conviction under § 844(i) for the arson of a police vehicle because the officer's responses to emergencies affected interstate commerce). The issue, though, is not whether all fire stations and fire departments affect interstate commerce; the jurisdictional element of § 844(i) requires us to focus our attention only on whether the HFS is used in an activity affecting interstate commerce.

We conclude that a rational juror could find beyond a reasonable doubt that the HFS was used in an activity that affected interstate commerce because its role in fighting fires constituted an active, rather than a passive, employment in interstate commerce. *See Latouf*, 132 F.3d at 325. Six aspects of the HFS demonstrate this connection. First, the HFS housed firefighting equipment, including trucks, hoses, nozzles, and uniforms, which the HFD purchased from out of state, which the HFD sent for repairs out of state, and which perished in the fire. The precise dollar amount of this equipment is not known, but given that the equipment destroyed included at least one fire vehicle, it was not trivial. Second, the HFD charged $500 to out-of-state insurance companies for fighting fires outside of the Henning city limits, although it only did so a few times annually. Third, the HFD paid its volunteers wages based on the amount of time spent on a fire scene, although these wages generally have not exceeded $1000 annually.

On their own, these first three factors may not form an adequate nexus to interstate commerce under *Jones*. If the purchase of equipment from out-of-state were the only link between the HFS and interstate commerce, the dissent might be right that this case is easier than, or at least as easy as, *Jones* given that the acquisition of a mortgage, natural gas, and insurance from out-of-state providers was the extent of the interstate commerce connection in *Jones*. The dissent's

belief that this is an easier case than *Jones* sidesteps fundamental differences between *Jones* and this case, for much more than the mere purchase of supplies from out of state ties the HFS into the web of interstate commerce. As demonstrated below by the final three links to interstate commerce, we find it persuasively clear that the HFS was used in an activity affecting interstate commerce.

Fourth, the HFD is charged with responding to fire emergencies within the Henning city limits. In the past, the HFD has responded to emergency calls from several businesses in Henning, including a market and a laundry facility. In the future, it is certain that the HFD will be called upon to fight fires at other businesses in Henning.[13] Preventing the destruction of commercial establishments strikingly affects interstate commerce by preserving entities directly engaged in interstate commerce.

Fifth, the HFD serves to protect both the channels of commerce and the instrumentalities of commerce because it is the primary emergency services provider for the stretch of U.S. Route 51 going through Henning. The HFD has responded (and will respond in the future) to incidents and accidents both on U.S. Route 51 and at the U.S. Route 51 rest area. The HFD's role in extinguishing fires, saving lives, and keeping U.S. Route 51 clear impacts interstate commerce. The HFD protects passenger vehicles carrying tourists and travelers voyaging through western Tennessee, it safeguards the interstate shipments of goods, and it permits the freeflow

---

[13]The town of Henning is the site of the Alex Haley Museum, several antique shops, a restaurant, two beauty salons, two grocery stores, a bank branch, an auto parts store, twenty churches, 161 renter-occupied housing units, and a clothing manufacturer that employed seventy-five people in 2002.

of trucks and buses through the area.[14] The HFD's firefighting capabilities in this regard affect interstate commerce, because insuring that the channels of commerce are kept open and the instrumentalities of commerce are protected is not a passive or passing connection to interstate commerce.

Sixth, and finally, the presence of the HFS and the HFD impacts insurance rates in Henning. The absence of the HFS, and the impact on the HFD's competency that is wrought by the loss of the HFS, directly alters the PPC, which helps insurance companies calculate fire insurance premiums. As a result of the fire, Henning will have a worse PPC, and insurance premiums will rise. The presence of an active fire department in Henning thus significantly impacts the insurance rates of all the businesses (and homes) in Henning, which in turn influences the commercial transactions of those businesses, both in the sense of their relationships to their insurers and their profit margins.[15]

Any of these last three factors by itself demonstrates sufficiently that the HFS was used in an activity that affected interstate commerce, because its connection to commerce was

---

[14]Not only commercial shipping and passenger vehicles pass through Henning, but also passenger buses operated by Greyhound, Inc., shuttle between Memphis and Dyersburg (and to points further south and north). Additionally, active railroad tracks owned by the Illinois Central Railroad run parallel to U.S. Route 51 through Henning. Freight trains frequent these tracks and AMTRAK runs passenger service along this route, connecting Chicago to New Orleans, with stops in Dyersburg to the north and Memphis to the south. Any fire emergency in Henning involving a bus or a train would require the assistance of the HFD.

[15]We do not conclude in this opinion that because every community's PPC depends on the training and geographic distribution of fire companies, all fire stations are automatically used in an activity affecting interstate commerce. Given Congress's explicit instruction that the application of § 844(i) depends on the specific circumstances of a particular fire station, we limit our analysis to the fire station in Henning.

more than passive or passing. Taken together, along with the first three factors, they show that the connection of the HFS to interstate commerce resembles the links between interstate commerce and the church in *Rayborn*, the dormitory in *Sherlin*, and the police car in *Bellflower*. The HFS and the HFD have a definite impact upon the economy of Henning that is no less significant than a church purchasing radio time or a nonprofit college attracting students from other states. The HFS permits local businesses to operate, enables the free flow of goods and passengers through the state of Tennessee, lowers the costs of doing business by decreasing fire insurance premiums, and directly engages in commercial transactions, in a more minor way, through the purchase of supplies and the billing of insurance companies. Accordingly, any rational juror could conclude beyond a reasonable doubt that the jurisdictional element was met here because the HFS is actively used in an activity that affects interstate commerce.

### III. CONCLUSION

Because we conclude that both parts of the *Jones* test have been satisfied, we hold that there is sufficient evidence to support the indictment as the HFS was used in an activity affecting interstate commerce. We thus **REVERSE** the judgment of the district court and **REMAND** for further proceedings under § 844(i) consistent with this opinion.

------

### DISSENT

------

SUTTON, Circuit Judge, dissenting.

"Some say the world will end in fire, Some say in ice." Robert Frost, *Fire and Ice*, *in The Poetry of Robert Frost* 220 (Edward Connery Lathem ed., 2002). From what the 970 residents of Henning, Tennessee have seen of John Laton, their fire chief, one could certainly understand why they would "hold with those who favor fire." *Id.*

Yet the incompatibility of this crime with this alleged criminal merely serves as a prelude to other oddities of this case. Consider what happened *after* the fire chief set fire to the Henning Fire Station. While arson is a state-law felony in Tennessee, as in all States, neither the local prosecutors nor the Attorney General of Tennessee indicted this defendant. While the federal crime of arson applies just to property "used in" interstate commerce, 18 U.S.C. § 844(i), the National Government indicted this defendant for destroying a building that has a uniquely public, non-commercial and sovereign purpose. And while the United States acknowledged at oral argument that it was not aware of a single other prosecution under § 844(i) for the arson of a local public building, the United States Attorney for the Western District of Tennessee invoked this statute in response to the destruction of a rural fire department by a local fire chief.

This case, however, is not just unusual as a matter of fact, law, or history; it is also unusual as a matter of precedent. Three Terms ago, in a 9-0 decision, the United States Supreme Court held that § 844(i) does not apply to the burning of residential homes. *Jones v. United States*, 529 U.S. 848 (2000). In doing so, the Court made clear that the provision applies only to the destruction of buildings with an "active employment for commercial purposes, and not merely

a passive, passing, or past connection to commerce." *Id.* at 855. Fire stations are no more "active[ly]" used for "commercial purposes" than residential homes are. In point of fact, this would seem to be the easier case—as firefighting represents the epitome of an unbargaining public service and the arsonist in this instance represents the epitome of a local public official. To conclude otherwise is to embrace the view that even the most attenuated connections to commerce will suffice in prosecuting individuals under this statute, a perspective that by my reading of *Jones* is no longer an option for the lower courts. For these reasons and those elaborated below, I would affirm the judgment of the district court dismissing this case.

### I.

On March 3, 2000, John Laton allegedly set fire to the Henning, Tennessee Fire Station. At the time, Laton served as the Chief of the Henning Volunteer Fire Department, a city government position. Henning, Tenn. Mun. Code §§ 7-301, 7-305. Under Tennessee law and the Henning Municipal Code, Laton's job qualified him as a state officer, specifically an assistant to the state fire marshal, subject to all of the duties and obligations imposed on state officers under Tennessee's fire-prevention laws. Tenn. Code Ann. § 68-102-108; Henning, Tenn. Mun. Code § 7-308.

Henning is a small rural town located in western Tennessee. It has a population of 970 and sits in Lauderdale County (population 27,101). U.S. Census Bureau, Census 2000, Table DP-1. Henning lies about fifty miles north of Memphis and can be found at the crossroads of State Routes 87 and 209. (The author Alex Haley grew up in Henning.)

On September 18, 2001, a federal grand jury indicted Laton for arson in violation of 18 U.S.C. § 844(i). Laton moved to dismiss the indictment, arguing that § 844(i) did not encompass this incident because the Henning Fire Station was not "used in" interstate commerce or a commerce-affecting

activity. Before ruling on Laton's motion, the district court received a stipulation from the parties agreeing on several pertinent facts.

The stipulation contains few surprises. The parties agree, for example, that the function of the Fire Station building is to "house[] the fire fighting equipment including trucks, as well as the office, kitchen and meeting spaces for the Henning Volunteer Fire Department." The Henning Municipal Code adds that "[a]ll [such] apparatus, equipment, and supplies" must be "purchased by or through the town" and "remain the property of the town." Henning, Tenn. Mun. Code § 7-301.

The parties agree that the Fire Department responds to firefighting calls in a rural area of Tennessee that includes numerous residences, churches, public buildings, several businesses and one U.S. highway. In some instances, the Fire Department has provided emergency services to vehicles on fire and/or involved in accidents on the highway.

The parties agree that the Fire Department has occasional connections to three types of economic transactions. First, the Department has purchased equipment from, and had equipment repaired by, out-of-state vendors. Second, the Department charges a fee when it responds to calls outside the city limits, which it does on average no more than three times a year. According to the Henning Municipal Code, the Fire Department responds to such calls only when a fire outside the city limits threatens property within the city limits or when the mayor and aldermen grant the Fire Department permission to respond to the call. Henning, Tenn. Mun. Code § 7-307. City employees working at City Hall bill these fees, which amounted to $300 per call in March 2000, and have on occasion billed these fees directly to out-of-state insurance companies. The total amount billed in a year, the parties agree, does not exceed $1,000. Third, the City of Henning pays wages to the "volunteer" fire fighters based on the amount of time they spend at the scene of a fire. Total wages paid by the City in a typical year do not exceed $1,000.

According to the Municipal Code, the mayor and aldermen determine the compensation for Fire Department personnel. Henning, Tenn. Mun. Code § 7-305.

The parties lastly agree about the general economic impact of the loss of a fire station. In calculating property-insurance premiums, virtually all insurers of homes and businesses use a designation made by the Insurance Services Office called the Public Protection Classification (PPC). A community's PPC depends on the ability of fire departments to respond to calls. Property owners in areas with no fire service receive the highest PPC, and they accordingly pay substantially higher premiums than those paid by similarly-situated property owners who live in areas with a lower PPC.

The district court granted Laton's motion to dismiss the indictment. In doing so, the court concluded that the Henning Fire Station is not "used in" interstate commerce or in "an activity affecting interstate commerce," but is used for the non-commercial purpose of housing the City's Fire Department. To the extent that the activities of the Fire Department have any effects on commerce—through responding to fires, purchasing fire equipment, paying wages, receiving fees or affecting insurance rates—the district court added that they are merely "incidental" and "passive, at best." That attenuated connection to interstate commerce, the court concluded, did not suffice to bring this arson within the compass of § 844(i) or of the Supreme Court's recent interpretation of the provision in *Jones v. United States*, 529 U.S. 848 (2000).

## II.

The text of the statute does not provide a natural home for this prosecution. Section 844(i) provides in pertinent part: "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate commerce or foreign commerce or in any activity

affecting interstate or foreign commerce shall be imprisoned . . . ." 18 U.S.C. § 844(i).

By its terms, § 844(i) combines a broad grant of statutory authority (to federalize the arson of "any" property) with a broad limitation on that language (to do so only with respect to property "used [1] in interstate or foreign commerce or [2] in an activity affecting interstate or foreign commerce"). Congress defines "interstate or foreign commerce" for these purposes to mean "commerce between any place in a State and any place outside of that State, or . . . between places within the same State but through any place outside of that State." 18 U.S.C. § 841(b).

As commonly understood, these words do not cover the arson of a rural fire station by a local fire chief. Fire stations are not naturally referred to as property used in interstate commerce or in commerce-affecting activity. By everyday standards of language, common sense and tradition, local governments build fire stations to put out fires and save lives, activities that serve distinctly intrastate public-safety objectives, not interstate commercial ends.

### III.

Precedent reinforces this conclusion. Three years ago, *Jones v. United States*, 529 U.S. 848 (2000), construed the same statute and determined that it does not apply to a typical private residence. *Id.* at 850–51.

The Court initially explained that Congress did not "invoke its full authority under the Commerce Clause" in enacting § 844(i). *Id.* at 854. While Congress might have "'define[d] the crime . . . as the [destruction] of a building whose damage or destruction might affect interstate commerce,'" it instead required "'that the damaged or destroyed property . . . itself have been used in commerce or in an activity affecting commerce.'" *Id.* at 854 (quoting *United States v. Mennuti*, 639 F.2d 107, 110 (2d Cir. 1981) (Friendly, J.)).

In determining whether an alleged arson fits within the terms of the statute, *Jones* instructs lower courts to ask (and answer) two questions. First, a court must determine "'the function of the building itself.'" *Id.* at 854 (quoting *United States v. Ryan*, 9 F.3d 660, 675 (8th Cir. 1993) (Arnold, C.J., concurring in part and dissenting in part)). Second, a court must "'determin[e] whether that function affects interstate commerce,'" *id.*, mindful that this requires "*active employment for commercial purposes*, and not merely a passive, passing, or past connection to commerce," *id.* at 855 (emphasis added).

The burning of the Henning Fire Station does not satisfy these requirements. Viewed from any angle, the Fire Station served sovereign rather than commercial ends. The Fire Station constitutes municipal real property (a building and land), used to store municipal personal property (firefighting equipment), deployed by a municipal entity (the Fire Department), to perform a uniquely municipal function (firefighting). Local governments simply do not "sell" fire services "in the ordinary commercial sense." *Cleveland v. United States*, 531 U.S. 12, 23–24 (2000) (a State "does not 'sell' video poker licenses in the ordinary commercial sense" and a State's interest in them "surely implicates the Government's role as sovereign, not as property holder"). They instead provide an eminently useful, sovereign and necessary public service. *Id.*; *see also Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 344, 348 (4th Cir. 2000) (stating that "it is difficult to conceive of a service associated more closely with the state than the provision of fire protection services," and holding that a Maryland volunteer fire department that was formed as a non-profit corporation is a state actor for § 1983 purposes); Tenn. Code Ann. § 29-20-102(3)(A) (for purposes of governmental immunity, the term "governmental entity" includes "municipalit[ies]" and "nonprofit volunteer fire department[s] receiving funds appropriated by . . . a municipality"); *cf. United States v. Monholland*, 607 F.2d 1311, 1316 (10th Cir. 1979) (rejecting the argument that a pickup truck used by a

state court judge to drive back and forth from court was used in a commerce-affecting activity just because state court proceedings may have some effect on commerce).

That the Fire Station served sovereign rather than commercial objectives should be dispositive here. For while § 844(i) does not necessarily require the property at issue to be used for an *interstate* purpose, it does require the property to be used for a *commercial* purpose. Only buildings, *Jones* instructs, "active[ly] employ[ed] for commercial purposes," 529 U.S. at 855, "affect[] interstate or foreign commerce" within the meaning of § 844(i). Buildings offered for rent and those from which goods and services are sold fall within § 844(i)'s compass because they serve commercial purposes, whether or not the commercial enterprises that use them have a profit motive. *Russell v. United States*, 471 U.S. 858, 862 (1985) (rental property); *United States v. Rayborn*, 312 F.3d 229, 234 (6th Cir. 2002) (church building used to record radio messages to be broadcast out of state on commercial radio); *United States v. Sherlin*, 67 F.3d 1208, 1213 (6th Cir. 1995) (private college dormitory); *United States v. Terry*, 257 F.3d 366, 369–70 (4th Cir. 2001) (church building with daycare center); cf. *Camps Newfound/Owatanna, Inc. v. Town of Harrison*, 520 U.S. 564, 584 (1997) (holding that the dormant Commerce Clause applies to the not-for-profit sector of the economy). *But see United States v. Lamont*, 330 F.3d 1249, 1259 (9th Cir. 2003) (Reinhardt, J.) (church building "used . . . in ordinary religious activities" is not covered); *United States v. Rea*, 300 F.3d 952, 962 (8th Cir. 2002) (church annex with de minimis commercial functions is not covered). In marked contrast to the activities at issue in every one of these cases, governmental buildings in general and local fire stations in particular are not "active[ly] employ[ed] for commercial purposes." *Jones*, 529 U.S. at 855.

IV.

A.

Other interpretive guidelines, each of which *Jones* endorsed in construing § 844(i), point to the same conclusion. In determining whether a federal criminal statute applies to the arson of a local public building by a local public official, *Jones* reminds us that we do so in the shadow of several constitutional considerations. First of all, "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *Jones,* 529 U.S. at 857 (quotation omitted). *See also United States v. Bass*, 404 U.S. 336, 349 (1971) (applying this principle, as in *Jones*, to a setting where one construction of a statute would "define as a federal crime conduct readily denounced as criminal by the States"). In applying this constitutional-avoidance principle to the arson of a private residence, *Jones* emphasized "that the area was one of traditional state concern and that the legislation [was] aimed at activity in which neither the actors nor their conduct has a commercial character." 529 U.S. at 858 (citation and quotation omitted). *See United States v. Lopez*, 514 U.S. 549, 567 (1995) (holding that the Gun-Free School Zone Act exceeds Congress's authority to regulate commerce).

*Jones* likewise teaches that federal courts should not casually read a statute in a way that alters the federal-state balance. When the National Legislature wishes to regulate an area traditionally regulated exclusively by the States, it must "convey[] its purpose clearly." *Jones*, 529 U.S. at 858 (citation and quotation omitted). In *Jones*, a unanimous Court held that Congress had not clearly conveyed a desire to criminalize the arson of a private dwelling. *Id.* Not long after *Jones*, *Cleveland v. United States*, 531 U.S. 12 (2000), reached a similar conclusion in construing the mail-fraud statute. There, the Court (again unanimously) declined to "approve a sweeping expansion of federal criminal

jurisdiction in the absence of a clear statement by Congress" and refused to extend the statute to cover "a wide range of conduct traditionally regulated by state and local authorities." *Id.* at 24. *See id.* at 27 ("Absent clear statement by Congress, we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States."). *See also Gregory v. Ashcroft*, 501 U.S. 452, 467 (1991) ("We will not read the ADEA to cover state judges unless Congress made it clear that judges are *included*.").

*Jones* finally explains that these rules have special application in the context of criminal statutes. "[W]hen choice has to be made between two readings of what conduct Congress has made a crime," courts should not "choose the harsher alternative . . . [unless] Congress [has] spoken in language that is clear and definite," and, accordingly, any "ambiguity . . . should be resolved in favor of lenity." *Jones*, 529 U.S. at 858; *see Cleveland*, 531 U.S. at 26 ("[W]e decline to attribute to [the mail-fraud statute] a purpose so encompassing where Congress has not made such a design clear."); *id.* at 25 ("[T]o the extent that the word 'property' is ambiguous . . . , we have instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'") (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)); *Bass*, 404 U.S. at 348 ("This policy embodies 'the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should.'") (quoting H. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, in *Benchmarks* 196, 209 (1967)).

These principles assuredly apply here. "[A]rson," *Jones* reminds us, "is a paradigmatic common-law state crime." 529 U.S. at 858. It is a felony in all States, and that has been true since colonial days. *See* John Panneton, *Federalizing Fires: The Evolving Federal Response To Arson Related Crimes*, 23 Am. Crim. L. Rev. 151, 151 (1985). *See generally* Arthur F. Curtis, *A Treatise on the Law of Arson* (1936). And the Federal Government's role in this area historically has been

a limited one. Not until 1982 did Congress enact the first federal law prohibiting the arson of a "building" "by fire." *See Jones*, 59 U.S. at 852–53 & n.4.

Indeed, this case appears to be not just an awkward exercise of federal power, but a nearly unprecedented one. At oral argument, counsel for the Federal Government could not identify a single other federal prosecution for arson of a governmental building under this provision. The majority cites a single unpublished decision, *United States v. Woodward*, No. 93-3123, 1993 WL 498178 (10th Cir. Dec. 2, 1993), decided before *Jones*, to counter this admission. But *Woodward*, which concerned an arson arising from a botched robbery, does not address any of the issues raised here or in *Jones*. Even the most charitable reading of *Woodward*, at any rate, suggests that it is a solitary and unexplained exception to the traditional rule that the Federal Government does not construe § 844(i) as applying to the arson of government buildings and as displacing the criminal-law choices of local governments in this area.

In contrast to the minimal federal interests in this case, the state interests would seem to be at their apex. Surely the commission of "a paradigmatic common-law" crime (*Jones*, 529 U.S. at 858) by a Henning official involving Henning property is a matter traditionally taken up, if not in Henning, at least in Nashville. Tennessee imposes criminal sanctions on state fire officials (such as the Chief) who fail in their official duties. Tenn. Code Ann. § 68-102-139. And Tennessee, of course, makes arson a felony. *Id.* § 39-14-301. That there is friction between the policy choices of the National Legislature and the Tennessee Legislature over the appropriate criminal sanction for this felony only underscores the sensitivity of the issue and the inter-branch tension raised by the United States' position. *Compare* 18 U.S.C. § 844(i) (providing for a five-year minimum sentence and twenty-year maximum sentence under these circumstances), *with* Tenn. Code Ann. §§ 39-14-301(b)(1), 40-35-111(b)(3) (providing for a shorter three-year minimum sentence and fifteen-year

maximum sentence under these circumstances). *See Jones*, 529 U.S. at 859–60 (Stevens, J., concurring, joined by Thomas, J.) (such a disparity "illustrates how a criminal law like this may effectively displace a policy choice made by the State" and, for this reason, courts "should interpret narrowly federal criminal laws that overlap with state authority unless congressional intention to assert its jurisdiction is plain"). The Federal Government's policy choice to authorize a 5–20 year sentence for this crime effectively displaces the State's policy choice to authorize a 3–15 year sentence for the same crime, and that is true whether the State opts not to prosecute Laton in the future or exercises its discretion to prosecute him under state law as well (and potentially create an 8–35 year sentence). *See Heath v. Alabama*, 474 U.S. 82, 93 (1985) (holding that a double jeopardy violation does not result from prosecutions by different sovereigns arising from the same act).

The Federal Government's own prior guidance in this area to United States Attorneys shows respect for many of these concerns. The Department of Justice recognizes that Congress intended "Restraint in [the] Exercise of Federal Jurisdiction" under this statute. 9 *United States Attorneys' Manual* § 63.902 (Mar. 2001). When Congress enacted the federal explosives statute in 1970, and amended it to cover arson by fire in 1982, it made clear that "[n]o provision of [the statute] shall be construed as indicating an intent on the part of Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter." 18 U.S.C. § 848. The Criminal Division of the Justice Department "interprets [this provision] as a statement of congressional intent that the Federal government—*absent a specific Federal interest*—will not become involved in bombing matters that can be adequately investigated and prosecuted by local authorities." 9 *United States Attorneys' Manual* § 63.902 (emphasis added).

In view of this guidance, the Federal Government's decision to prosecute here is difficult to understand. No one

has questioned the ability of local prosecutors to enforce state law in this area. No one has questioned Tennessee's ability adequately to investigate and prosecute a local arsonist at the state level, if for some reason it cannot be done at the local level. *See* Tenn. Code Ann. § 8-7-106(b)(4) (permitting a district attorney to "specially appoint" the state attorney general "to conduct specific criminal proceedings"); Tenn. Const. art. VI, § 5 (permitting a court to appoint a special prosecutor if the district attorney fails to prosecute). And, consistent with the *United States Attorneys' Manual*, no one has identified a "specific Federal interest" in this case, just exceedingly local ones.

B.

Because the National Government seeks to apply § 844(i) to a traditional state-law crime in a setting where no apparent federal interest exists, *Jones* requires the Government to show that the provision unambiguously extends to this arson. It has not done so.

*First*, the arson of a local fire station does not naturally—or plainly—cover a building "used in interstate commerce" or commerce-affecting activity. 18 U.S.C. § 844(i). Still less does such an arson concern a building with an "active employment for commercial purposes." *Jones*, 529 U.S. at 855. But even if one disagrees with this analysis, the best that can be said in response is that the provision remains ambiguous about its extension to the arson of a fire station. And that conclusion requires the application of the *Jones* default principles and the narrowing interpretation that they compel.

*Second*, Congress does not generally regulate governmental entities in such an opaque manner. Instead of casting a wide net of regulation, indirectly picking up local governmental activities that happen to be involved in interstate commerce while leaving out those that happen not to be, Congress generally regulates its sovereign sisters with much greater

specificity—either by regulating them by name or by referring directly to entities that receive federal funds. Several other statutes (too many, in fact, to list) demonstrate that when Congress wishes to regulate sovereign activities or property, it tends to say so far more explicitly. *See, e.g.*, Fair Labor Standards Act, 29 U.S.C. §§ 203(d) ("'Employer' . . . includes a public agency."), 203(r)(2) ("For purposes of [defining 'enterprise'], the activities performed by any person or persons . . . in connection with the activities of a public agency shall be deemed to be activities performed for a business purpose."), 203(e)(2) ("In the case of an individual employed by a public agency, such term ['employee'] means . . . any individual employed by a State, political subdivision of a State, or an interstate governmental agency . . . ."), 216(b) (providing for enforcement against "any employer (including a public agency)"); Age Discrimination in Employment Act, 29 U.S.C. § 630(b) ("'[E]mployer' means . . . a State or political subdivision of a State."); Family and Medical Leave Act, 29 U.S.C. §§ 2611(4)(A) ("'[E]mployer' . . . includes any public agency."); 2611(4)(B) ("For [these purposes], a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce."). Against this legislative backdrop, Congress's decision not to mention governmental property more specifically in § 844(i) at a minimum establishes ambiguity about the scope of the provision. *See generally Cleveland*, 531 U.S. at 23–25 (concluding that the mail-fraud statute, which covers "property" obtained by "fraudulent pretenses," 18 U.S.C. § 1341, does not apply to a State's sales of video poker licenses because, among other reasons, the meaning of "property" is "ambiguous" in this setting).

*Third*, § 844 itself confirms that Congress knew how to distinguish between eminently sovereign activities and run-of-the-mine commercial activities. One of the statutory neighbors to § 844(i) specifically criminalizes arson of certain governmental buildings—all buildings occupied by the Federal Government or those occupied by entities receiving federal assistance, which will frequently be local

governments. *See* 18 U.S.C. § 844(f)(1) ("Whoever maliciously damages or destroys . . . by means of fire or an explosive, any building . . . owned or possessed by . . . the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned."). If it is true that a statute is "known by the company it keeps," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995), then § 844(f) illustrates that Congress knew how to criminalize the destruction of all manner of public buildings when it wished to do so and suggests that § 844(i) was designed to reach commercial rather than governmental buildings. Nor, in view of the United States' sweeping construction of § 844(i), which would cover all governmental buildings, does the prohibition of burning federal governmental buildings in § 844(f)(1) have any independent office. We generally construe statutes to avoid such redundancy, not accentuate it. *See, e.g., Jones*, 529 U.S. at 857; *Kungys v. United States*, 485 U.S. 759, 778 (1988).

All of this goes to prove one point. If it is true that federal regulation of the arson of a private home implicates these three expectations of clarity (constitutional avoidance, alteration of the federal-state balance, and the rule of lenity), as *Jones* holds, then assuredly the torching of the local fire station does so as well. For here we have not just a matter of traditional local concern (arson), but two other factors as well—property uniquely amenable to local regulation (a city building) and an actor (the fire chief) uniquely at the beck and call of the local citizenry. *Jones*, in short, was the harder case. And if *Jones* applied each of these ambiguity default principles, then I would do so as well. In this instance, the application of those principles all points in one direction: A federal arson statute that does not mention public buildings by name, that is juxtaposed with a provision that does mention public buildings by name, and that requires the public property to be actively used for commercial purposes does not unambiguously cover the burning of a local fire station by the local fire chief.

### V.

In the face of these considerations, the United States counters that at least some activities that take place at the Henning Fire Station are commercial in nature and that these activities suffice to legitimate this prosecution. The Federal Government cites three activities in particular: (1) that the Fire Department sometimes purchases equipment from, or has equipment repaired by, out-of-state vendors; (2) that the Fire Department charges a $300 fee (billed through City Hall) on the few occasions each year when it responds to a call outside city limits; and (3) that the City of Henning pays wages to the "volunteer" fire fighters based on the amount of time they spend at a fire scene.

The Fire Department's purchases and repairs do not advance the United States' position. A fire station is no more "used" in the "activity" of purchasing interstate fire equipment than a residence is used in the activity of purchasing interstate natural gas, mortgages, or insurance—all activities that the Court rejected as jurisdictional hooks in *Jones. See* 529 U.S. at 856.

Neither does the fee occasionally charged by the Fire Department support this prosecution. The size of the fee ($300) and the infrequency with which it is charged (one to three times per year, when the Department responds to fires outside town limits) hardly suggest *active employment* for commercial purposes—which is what *Jones* requires. If de minimis activity of this sort transformed every governmental building into one used for commercial purposes, then all public property in this country would be one bake sale away from federal jurisdiction. No fair reading of the statute suggests that this is what Congress meant to do.

More importantly, a State does not engage in traditional commercial activities every time it receives a sum of money in exchange for something or for that matter any time it imposes a tax. *See Cleveland*, 531 U.S. at 23 ("Louisiana . . .

does not 'sell' video poker licenses in the ordinary commercial sense."). That is especially true when the revenue arrives, as here, after the fact. *See id.* at 22 ("The State receives the lion's share of its expected revenue . . . only *after* [the licenses] have been issued to licensees."). No one suggests that the Fire Department would decline to extinguish a fire until and unless the fee was paid. Firefighters do not haggle over fees. In this instance, in fact, they are not even the ones who charge the fee; it is billed by City Hall.

At all events, this argument proves too much. Were the collection of revenue sufficient to trigger § 844(i), then presumably tax collection would suffice as well, leaving no public property untouched. And the separate provision covering buildings occupied by entities "receiving Federal assistance," 18 U.S.C. § 844(f), "would have no office," *Jones*, 529 U.S. at 857, because receiving a federal grant *is* an economic transaction. "'Judges should hesitate . . . to treat statutory terms in any setting as [surplusage],'" *Jones* instructs, "'and resistance should be heightened when the words describe the element of a criminal offense.'" *Id.* at 857 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 140–41 (1994)).

The Federal Government's reliance on the fact that the Henning Fire Department occasionally "pays wages" to its "volunteer" firefighters fails for much the same reason. Congress, to be sure, may as a matter of power regulate the wages paid to firefighters, which is itself an economic transaction. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 555–56 (1985). But that does not mean Congress sought in this instance to regulate criminal conduct with respect to the buildings that house firefighters or sought to do so on this basis. Teachers also receive wages, but that does not necessarily permit Congress to make possessing a gun in a school zone a federal crime. *See Lopez*, 514 U.S. at 567. Indeed, if federal wage-and-hour laws have any relevance in this context, it is to show that Congress views firefighting and the nominal wages paid by the government to

these volunteers differently from ordinary commerce. *See* Fair Labor Standards Act, 29 U.S.C. §§ 203(e)(4)(A) (exempting individuals who volunteer to serve a public agency even when paid "nominal" wages), 207(k) (exempting firefighters from the Act's overtime provisions).

Nor, for similar reasons, does it make any difference that fire stations house fire trucks, which (like police cars) may be used in interstate commerce and indeed are instrumentalities of interstate commerce. *See Belflower v. United States*, 129 F.3d 1459, 1462 (11th Cir. 1997) (concluding that § 844(i) covered the bombing of a police car). *See also Lopez*, 514 U.S. at 558 ("Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activites."); *United States v. McHenry*, 97 F.3d 125, 126 (6th Cir. 1996) ("[C]ars are themselves instrumentalities of commerce.") (quotation omitted). The same of course could have been said in *Jones*: It is the rare private residence that does not house a car.

Also unavailing is the United States' reliance on the economic *impact* of a fire station's destruction—specifically, the lower PPC ratings, the higher insurance costs, or the inability to extinguish fires affecting local businesses or (occasionally) burning cars on the highways. Accepting this position would rewrite the statute to say something that it does not. As *Jones* indicates, Congress did not "define the crime . . . as the [destruction] of a building whose damage or destruction might affect interstate commerce," but instead required "that the damaged or destroyed property . . . itself have been used in commerce or in an activity affecting commerce." 529 U.S. at 854 (citation and quotation omitted); *cf. Lopez*, 514 U.S. at 564 (rejecting a "costs of crime" rationale for connecting federal legislation banning guns near schools to interstate commerce). Two of *Jones*' overriding lessons—that § 844(i) does not reach the full extent of Congress's Commerce Clause powers, 529 U.S. at 854, and that the statute applies only when the building itself is

"active[ly] employ[ed]" in commerce, *id.* at 855—cannot be squared with the United States' reliance on the economic impact of destroying the building or on the non-commercial activity (fighting fires) performed by the occupants of the building.

But, perhaps most critically, this argument has no logical stopping point. *All* governmental services affect commerce at some level, whether those services are legislative, executive or judicial. Asked at oral argument to identify a single governmental building beyond the reach of § 844(i) under the Government's theory, counsel for the United States could not name one. Whether the state building at issue houses the Department of Commerce or the Ministry of Uneconomic Affairs, it would seem, makes no difference. Either way, what goes on there first and foremost is a public and sovereign service, which in the main will rarely (if ever) be deemed "actively" "commercial" in any traditional sense of the terms—even if all such activities eventually affect commerce in one way or another. It is precisely the role of the clear-statement rules identified above, and applied faithfully in *Jones*, to prevent federal courts from extending the reach of federal criminal statutes on the basis of the kinds of attenuated connections to interstate commerce that the Federal Government has raised here. If the majority is right that a state liquor store, a state building housing a lottery commission or a post office building (though a federal building) amounts to a building with an "active[] . . . commercial purpose," that is only because the statute unambiguously covers these properties, not because it unambiguously covers an eminently non-commercial fire station. At any rate, in view of *Jones* and *Cleveland,* 531 U.S. at 23–24 (a State "does not 'sell' video poker licenses in the ordinary commercial sense" because the activity "implicates the Government's role as sovereign"), it seems doubtful that the statute unambiguously covers even these buildings.

Neither may one overcome these objections by suggesting that, in the world of case-by-case determinations, the outcome here will be a ticket good for one train and one train only. Until now, there have been no other trains in the station, so it is not clear what the concession concedes. More to the point, it still remains to be seen what government buildings analytically would *not* be covered by this type of analysis—as the United States seems to recognize.

One last point deserves mention. The United States also seeks refuge in the legislative history, relying on an unenacted forerunner to § 844(i), which applied to the destruction of property used "for business purposes," and on the statements of some legislators that § 844(i) as enacted would cover "police stations." Congress eventually omitted the words "for business purposes," and while doing so several House members individually explained that the language was eliminated because some members were afraid that the statute would not reach "police stations." *See Explosives Control: Hearings Before Subcomm. No. 5 of the House Comm. on Judiciary on H.R. 17154, H.R. 16699, H.R. 18573 and Related Proposals*, 91st Cong. 33 (1970) ("*Hearings*") (Rep. McCulloch); *id.* at 56 (Rep. Rodino); *id.* at 73 (Rep. Polk); *id.* at 79 (Rep. Smith). The United States infers from this unenacted legislation and from these statements by individual representatives that Congress intended § 844(i) to cover the arson of city buildings.

This argument fails for three reasons. *First*, when clarity in the text of a law is required, legislative history by definition cannot supply it. *See United States v. Nordic Village*, 503 U.S. 30, 37 (1992) ("[L]egislative history has no bearing on the ambiguity point [because] . . . the 'unequivocal expression' of elimination of [the United States'] sovereign immunity that we insist upon is an expression in statutory text."); *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989) ("[E]vidence of congressional intent must be both unequivocal and *textual*" to provide the clarity necessary to abrogate a State's Eleventh Amendment immunity;

"[l]egislative history generally will be irrelevant.") (emphasis added); *Gregory*, 501 U.S. at 470 (equating the clear-statement rule applied in the sovereign immunity context with the clear-statement rule applied in the context of Commerce Clause legislation that would alter the federal-state balance); *see also Cleveland*, 531 U.S. at 24, 27 (requiring a "clear statement" to extend "federal criminal jurisdiction" to an area "traditionally policed by the States").

*Second*, the use of legislative history to *broaden* the reach of a law seems particularly inappropriate in a setting like this one—where we have not just the risk of the alteration of the federal-state balance and the imperative to avoid constitutional questions but the imposition of a criminal sanction. It stretches the necessary legal fiction that every person knows the law, *see McBoyle v. United States*, 283 U.S. 25, 27 (1931), to the breaking point when the unenacted views of a handful of legislators (here, for example, a few floor statements suggesting that the law covers police stations) become the basis for putting someone behind bars. Because "the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal," *Liparota v. United States*, 471 U.S. 419, 427 (1985), and because no one can plausibly conclude that a committee report or the floor statements of selected legislators provides such warning, the use of such material seems utterly incompatible with the purposes of the rule or the civilized interests it protects. In at least one opinion, the Supreme Court has said that very thing: "Even were the statutory language regarding the scope of a court's authority to order restitution ambiguous, longstanding principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant, *Simpson v. United States*, 435 U.S. 6, 14–15 (1978) (applying rule of lenity to federal statute that would enhance penalty), preclude our resolution of the ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history." *Hughey v. United States*, 495 U.S. 411, 422 (1990). While dicta in other cases may suggest a different approach, *see*

*Moskal v. United States*, 498 U.S. 103, 108 (1990), I am aware of no decision from our Court or from the United States Supreme Court that *broadens* the reach of a criminal statute on the basis of legislative history and that does so in spite of these objections. The only Justices of the Supreme Court who have squarely addressed the issue (to my knowledge) have firmly concluded that "it is not consistent with the rule of lenity to construe a textually ambiguous penal statute against a criminal defendant on the basis of legislative history." *United States v. R.L.C.*, 503 U.S. 291, 307 (1992) (Scalia, J. concurring in part and concurring in the judgment, joined by Kennedy, J., and Thomas, J.).

*Third*, the inference the Federal Government seeks to draw from the unenacted version of § 844(i) not only comes from an inappropriate source but also rests on a discredited premise. The Supreme Court has frequently rejected arguments based on unenacted legislation, noting the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (quoting *Trailmobile Co. v. Whirls*, 331 U.S. 40, 61 (1947)); *Puerto Rico Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 501 (1988) ("[U]nenacted approvals, beliefs, and desires are not laws."). *See also United States v. Granderson*, 511 U.S. 39, 69 (1994) (Kennedy, J., concurring) ("This admonition takes on particular importance when the Court construes criminal laws.").

All of this perhaps explains why *Jones* mentions the very same legislative history that the United States cites here, *see Jones*, 529 U.S. at 853 n.5, then proceeds not only to ignore the alleged inferences created by this history but also proceeds to contradict them. Thus, while Congress omitted language proposed in an earlier draft of the bill ("for business

purposes," *Hearings* at 30) ostensibly suggesting that no business purpose is needed, *Jones* adopts an "active . . . commercial purpose[]" test for ascertaining whether § 844(i) applies, 529 U.S. at 855. And some of the same legislators who suggested that § 844(i) would cover the arson of a "police station" also suggested that it would cover the arson of a "private home." *Hearings* at 56 (Rep. Rodino). *See also id.* at 289 (Rep. Goldwater) ("this bill should include any building, vehicle or any real property . . . not just businesses"); *id.* at 300–01 (Rep. Wylie) (suggesting that the bill should cover private dwellings and other property not used for business); *id.* at 304–05 (Rep. Cramer) ("a person has a right to safety and security of his home and to the security of his property"). But *Jones* of course specifically holds that § 844(i) does not cover private residences.

Because in the end the unbargained-for service of fighting fires is the antithesis of an activity engaged in for an "active . . . commercial purpose[]" and because *Jones* has charted a course that in my view controls us here, I would affirm the district court's judgment. That being a minority view, I respectfully dissent.