OPINION
{¶ 1} Defendant-appellant, John Kepiro ("appellant"), appeals his sentence and conviction on 25 counts of Gross Sexual Imposition ("GSI"). In 1987, appellant immigrated to the United States from Hungary. Shortly thereafter, he married Anna Payer, also a Hungarian immigrant, who had four children from a previous marriage. The children were still living in Hungary with their biological father. The children's father passed away and, in 1994, appellant rescued two of the children, twins, J.S. and A.S. from foster care. About six months later, their mother died from lung cancer. A.S. alleges that around that time, appellant began sexually molesting her. *Page 2 
 {¶ 2} A.S. claims that the molestation persisted regularly until 1998, although she did not tell anyone about it until 2003. The grand jury indicted appellant on 25 counts of GSI, all third-degree felonies. The only evidence against appellant was A.S.'s accusations. The jury convicted him on all counts, and the court sentenced him to an aggregate 12 years' incarceration. Appellant now appeals his conviction, arguing that there was insufficient evidence to convict. He also appeals his sentence on grounds that the trial court violated his due process rights by sentencing him under a statute that was not yet in effect when the majority of the alleged incidents occurred.
 {¶ 3} Ohio law sets the bar very high before an appellate court may reverse a jury verdict because of the weight of the evidence. Within those parameters, we cannot say that the jury got it wrong. Therefore, we affirm appellant's conviction. We do find error, however, in the trial court's sentencing and, accordingly, we vacate the sentence and remand for re-sentencing.
 {¶ 4} Appellant has assigned four errors for our consideration:
 I. THE VERDICT FORMS WERE INDADEQUATE [sic] TO SUPPORT APPELLANT'S CONVICTIONS FOR GROSS SEXUAL IMPOSITION AS A THIRD DEGREE FELONY, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.
 II. THE TRIAL COURT ABUSED ITS DISCRETION BY IMPOSING AN IMPERMISSIBLE SENTENCE FOR ACTS COMMITTED PRIOR TO JULY 1, 1996, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.
 III. THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT A PRISON TERM WAS MANDATORY FOR ACTS COMMITTED AFTER JULY 1, 1996, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW *Page 3 
UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.
 IV. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF GROSS SEXUAL IMPOSITION AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 5} The fourth assignment of error attacks both the sufficiency and weight of the evidence supporting appellant's conviction. Standing alone, either argument is dispositive, therefore, we address the fourth assignment of error first.
 {¶ 6} Sufficiency of the evidence is the legal standard applied to determine whether the evidence is legally sufficient, as a matter of law, to support the jury's verdict. State v. Smith (1997),80 Ohio St.3d 89. The weight of the evidence, also called "manifest weight," refers to the inclination of the greater amount of credible evidence offered at trial, and whether that greater weight of that evidence tends to support one side of the issue rather than the other. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. (quoting State v. Jenks [1991],61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v.Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781).
 {¶ 7} In considering whether appellant's convictions were supported by sufficient evidence, we turn to the pertinent portions of the record and transcript of the testimony in *Page 4 
the trial court. As we have said, the only evidence of appellant's guilt was the alleged victim's testimony. There was no physical evidence of sexual abuse, and the prosecution presented no other witnesses, psychological or otherwise, to corroborate A.S.'s allegations.
 {¶ 8} A.S. testified that the first instance of sexual molestation occurred about a week or two before her mother died on April 20, 1995. (Tr. 49, 55.) She claims that, on that occasion, she was lying on a futon with her brother and appellant, and that appellant placed her hand "on his private and started to move it up and down and said your daddyhas to have a little bit of fun since he brought you out here." (Tr. 54, 60.) (Emphasis added.) A.S. testified that this was the only time she touched appellant's penis, but that on subsequent occasions he touched her genitals. (Tr. 59, 60.) She described the second incident as having occurred several months later, while watching a Disney movie with appellant and her brother. She testified that the three of them were in her bedroom, and that while lying on her bed, appellant fondled her vaginal area from under her clothes. A.S. said she was nine years old at that time. She estimated that during calendar year 1995, appellant touched her vagina six times. (Tr. 64-65.)
 {¶ 9} In late 1995, Franklin County Children Services ("FCCS") came to appellant's home to investigate a report that appellant had been leaving the kids at home unattended for extended periods of time. (Tr. 69.) The complaint is believed to have been related by a neighbor, one of A.S.'s half-siblings. Id. FCCS talked with both of the children, and also with appellant, and despite the fact that the complaint made no mention of sexual abuse, the caseworker inquired about it (probably as a matter of formality). The investigation did not reveal evidence of any sexual abuse and, in fact, A.S. specifically *Page 5 
denied that appellant had touched her inappropriately. (Tr. 70-71.) The defense offered a copy of the FCCS intake referral form into evidence, which contained A.S.'s statement denying that anyone "ever touched her private places."
 {¶ 10} In spite of flatly denying any sexual abuse in late 1995, in August 2006, A.S. testified that appellant continued to molest her in the same manner, and with the same frequency. (Tr. 72-74.) She added that sometime in 1997, appellant began French kissing her, and as she started puberty, he also began touching her breasts. (Tr. 76.)
 [PROSECUTOR:] During the time period of 1997 looking at that 365-day-time period, January 1st through December 31st, how many times to your memory did [Mr. Kepiro] place his hand on the skin of your vagina?
 [A.S.:] Probably once or twice a month.
 Q. I'm sorry?
 A. Once or twice a month.
 Q. So would it have been at least six times?
 A. Yes.
 Q. And possibly quite a bit more than that?
 A. Yes.
(Tr. 77.)
 {¶ 11} On September 30, 1997, A.S. turned 12-years old. By that time, she and J.S. attended public school, went to church regularly, and had numerous friends and social acquaintances. Despite what appears to have been a wide social circle, no one close to appellant suspected what A.S. later alleged. *Page 6 
 {¶ 12} A.S. testified that the fondling continued until roughly August 1998, around the time when appellant remarried. (Tr. 84.) A.S. estimated five fondling incidents between January 1, 1998 and July or August of that same year. A.S. described the last incident as having occurred when she was watching television, while reclining on a futon in the living room. She said that appellant came into the living room, laid down on top of her, and "started grinding * * * moving up and down." (Tr. 85.) She said that she looked him in the eye, then turned her head and said nothing, and after that, "he got off of me and never touched me again." Id.
 {¶ 13} Later in 1998, FCCS came back to appellant's house to investigate another complaint, similar to the previous one. (Tr. 83, 84.) Again, no sexual abuse was reported. A.S. testified that she decided not to alert the caseworker to molestations because she thought that the incidents had stopped. In contrast, she also stated that the reason she never told anyone was because she was scared, and did not know whom she could tell. (Tr. 57.) On cross-examination, appellant's attorney probed A.S. regarding her continued failure, or neglect, to report the abuse. She contended that she declined to report the incidents because she was afraid of being placed in foster care.
 {¶ 14} In early 2002, A.S. ran away from home following an incident when appellant disciplined her by slapping her. This time, she immediately reported the incident to the police. FCCS again got involved. The joint investigation resulted in FCCS issuing a "safety plan" to appellant, which prohibited him from physically disciplining the children. The defense offered a copy of the safety plan into evidence at trial.
 {¶ 15} The scope of A.S.'s cross-examination also touched on a variety of issues not directly related to her accusations against appellant, including the slapping incident *Page 7 
and her running away from home. She admitted that the reason appellant had slapped her was because he caught her kissing an older man in a public place, and that appellant disapproved of her relationship with the man because of his age. This man, Peter Soos, was about ten years older than A.S. Also on cross-examination, A.S. revealed that one of her uncles (on her mother's side) was jailed for molesting a girl.
 {¶ 16} The prosecution rested its case after the close of A.S.'s testimony. Appellant's attorney moved for judgment of acquittal, arguing that the victim's testimony, standing alone, was insufficient to prove appellant's guilt. (Tr. 196-199.) Although the trial court denied the motion, the court acknowledged the weakness of the case: "It's certainly not the strongest of cases and I think both lawyers would concur with that. But it is a question of fact for the jury." (Tr. 198.)
 {¶ 17} After the trial court denied the defense's motion to acquit, they presented two witnesses to rebut A.S.'s testimony: Margie Jarrell — the woman whom appellant married in 1998, but had since divorced — and appellant himself. Ms. Jarrell denied having any knowledge of the alleged fondling, and further testified that she believed A.S. was a liar and a thief. When cross-examined by the prosecution, however, Ms. Jarrell admitted that she did not know A.S. during the bulk of the time the alleged abuse took place. Ms. Jarrell also had difficulty answering a question relating to an allegation that appellant intended to charge his children to help them get their citizenship. (Tr. 219.)
 {¶ 18} Appellant testified with the assistance of a courtroom interpreter, and wasted no time in flatly denying the allegations against him:
 Q. I'll just ask you: You have seen [A.S.] testify?
 A. Yes. *Page 8 
 Q. You've heard her testify?
 A. What do you mean? (Interpreter and defendant conferring.) Oh, yes.
 Q. She has said that you had taken her hand and put it on your penis.
 A. No, sir.
 Q. Do you know what your penis is?
 A. Yes.
 Q. Did you ever take [A.S.'s] hand and put it on your penis?
 A. No, sir.
 Q. She has said that she watched movies with you and [J.S.] and that you would put your hand down her pants or on her pants —
 A. No, sir.
 Q. — and touch her vagina.
 A. No, sir.
 Q. Do you know what a vagina is?
 A. Yes.
 Q. Did you ever, ever, ever touch [A.S.] in her private areas of body?
 A. Never I —
 Q. I'm sorry?
 A. Never touch it.
 (Interpreter and defendant conferring.) *Page 9 
 INTERPRETER: Never in my life.
 Q. Did you ever touch her breasts?
 A. Never.
 Q. Did you ever touch her down below the waist.
 A. Never.
 Q. Do you know why she is saying you did?
 A. Well, I'll tell you something, money. Money and.
 * * *
 THE INTERPRETER: Because of money and revenge.
 Q. Revenge for what?
 A. Well, she's — I buy for her car. I open for her an account because she's coming back to — after school she's coming home and she's said everybody have a car, everybody have account and how parents, how you feel. Why not. I don't care. You know, this all money. Never make it money. I do for her because she is happy. She is happy. She is never tell her and never tell her — never tell her do this different. [J.S.] and [A.S.], I buy one, I buy the both. And go to bank and open for an account. And after buy for her car, buy for her. I tell her, I will give you car, but I don't have any money pay for, you know, insurance. And she said okay. I go to McDonald's. I working in the paper to get insurance. I say okay. And that's why I buy this car. Go ahead. Everybody do this.
 But I open a bank account for her. She's not 16 years old. So she doesn't have a — a bank not give her an account. I put it under my name. I tell her don't touch. Maybe — I can tell her maybe just a bit. Every money, I paid the insurance. I paid everything, you know, it's parents after, you know —
(Tr. 231-234.) *Page 10 
 {¶ 19} Although he stumbled frequently during direct and cross-examination, appellant's denial was unequivocal. His testimony, moreover, was consistent with that of Ms. Jarrell — that A.S. fabricated the allegations because of anger and frustration over her inability to get U.S. citizenship.
 {¶ 20} In early October 2003, just before A.S. reported the molestation to the police, Ms. Jarrell testified that A.S. came to her house for a surprise visit. This was within a few days of A.S.'s 18th birthday. Ms. Jarrell had not seen A.S. in almost two years — since she had run away from home. She testified that A.S. demanded that she persuade appellant to help A.S. finalize her U.S. citizenship, and that if he did not, A.S. threatened to go to the police and report the molestation. A.S. said she could get $50,000 from the Ohio Victims of Crime Compensation Program if appellant was convicted. Although she admitted going to Ms. Jarrell's house, A.S. denied making any demands or threats. Coincidentally, perhaps, A.S. reported the abuse to the police at about the same time as the visit.
 {¶ 21} At the end of the day, either appellant's broken-English testimony lacked credibility, or A.S. simply appeared more credible, because the jury convicted appellant on all 25 counts. To the legal test of the sufficiency of the evidence supporting appellant's conviction, we must view all the evidence in a light most favorable to the prosecution. Unlike the jury, we did not have the luxury of watching A.S. testify. Because the jury believed A.S.'s testimony, we presume that her testimony was credible. Based on that assumption, we consider whether the evidence is sufficient to support each element of the crimes charged. We hold that it is. *Page 11 
 {¶ 22} We have already said, at least insofar as rape is at issue, there is no statutory requirement that a victim's testimony be corroborated. State v. Jackson (Feb. 20, 2001), Franklin App. No. 00AP-183 (citing State v. Love [1988], 49 Ohio App.3d 88, 91). Although the issue has not been squarely addressed by the Supreme Court of Ohio, this is the established view among the appellate districts who have decided it. See, e.g., State v. Heilman, Trumbull App. No. 2004-T-0133,2006-Ohio-1680, at ¶ 46; State v. Adams, Lorain App. No. 05CA008685,2005-Ohio-4360, at ¶ 13; State v. Wright (Mar. 21, 2002), Columbia App. No. 97 CO 35, at ¶ 23; State v. Corrothers (Feb. 12, 1998), Cuyahoga App. No. 72064; Love, supra; State v. Shafeek (Dec. 14, 1994), Montgomery App. No. 13666; State v. Rickard (Sept. 25, 1992), Mercer App. No. 10-91-5 (each citing State v. Gingell [1982],7 Ohio App.3d 364, 365). Although corroborating testimony, or evidence, gives greater weight to a victim's testimony, it is not a requirement.Shafeek, ibid. The only real difference between the crimes of rape and GSI is that the former requires actual penetration, where the latter does not. See R.C. 2907.01 et seq.; cf. R.C. 2907.05(A). Thus, under the current law, if the victim's testimony in a rape trial does not require corroboration, there is no legitimate reason to require corroboration in a trial for GSI.
 {¶ 23} Although A.S.'s testimony shows obvious weaknesses, sufficiency of the evidence does not take those circumstances into account. All that matters is whether a reasonable jury could have believed A.S.'s testimony. Accordingly, to the extent the fourth assignment of error alleges the evidence was insufficient to support the jury's verdict, we must overrule. *Page 12 
 {¶ 24} When considering the weight of evidence, the test is considerably different. In that regard, we sit as a "thirteenth juror," we weigh the quality of the evidence, and the credibility of the witnesses. See, e.g., State v. Robinson (Jan. 22, 2002), Franklin App. No. 01AP-748 (quoting Tibbs v. Florida [1982], 457 U.S. 31, 42,102 S.Ct. 2211; State v. Martin [1983], 20 Ohio App.3d 172, 175). All things considered, we determine whether the jury "clearly lost its way," in a manner that created such a "manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. This discretionary power should only be exercised in the extraordinary case where the evidence weighs heavily against the conviction. Indeed, the Ohio Constitution prevents us from overturning the jury's verdict without a unanimous vote by this panel. See Section 3(B)(3), Article IV, Ohio Constitution. ("No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause.") With this standard in mind, we turn to the evidence in this case.
 {¶ 25} The sole issue here is the victim's credibility, because, again, the victim's testimony was the only evidence weighing in favor of conviction. Clearly, A.S. exhibited some credibility issues, based on her testimony, the alleged facts at-large, and the circumstances and timing of her accusation.
 {¶ 26} As the trial judge acknowledged, this case is not very strong. At first glance, we take notice that the defense presented two witnesses, while the prosecution presented only one. Although Ms. Jarrell testified that she had no knowledge of the alleged molestation, A.S. made her allegations as to a time frame that effectively eliminates Ms. Jarrell's testimony from weighing against her own. Further, defense *Page 13 
counsel was afforded wide latitude during A.S.'s cross-examination. (Tr. 134-136.) Even though a victim's character is usually inadmissible in sex offense cases, a witness's reputation for truthfulness is always fair game. See, generally, State v. Williams (1986), 21 Ohio St.3d 33,34 (quoting R.C. 2907.02[D]); see, also, Evid.R. 608; but, see, Evid.R. 404(A)(2). Counsel for appellant delved into A.S.'s tumultuous past, exposed various inconsistencies in her stories, and attacked her reputation for dishonesty. (Tr. 136, 140, 173, 180.) Had counsel been denied that opportunity, there may have been prejudicial error (see, e.g., State v. Swann, 171 Ohio App.3d 304, 2007-Ohio-2010, at ¶ 12, citing Holmes v. South Carolina [2006], 547 U.S. 319, 126 S.Ct. 1727). But this did not happen.
 {¶ 27} On the other hand, appellant vehemently denied having any inappropriate or sexual contact with A.S. (Tr. 231-234.) He blamed the accusations on A.S.'s greed and desire to get revenge, citing her threats to Ms. Jarrell. (Tr. 233.) He also admitted slapping A.S., when he found her kissing Peter Soos in a public place. Shortly after this event was when A.S. ran away from home with Mr. Soos.
 {¶ 28} Ultimately, the jury believed A.S. And even though we sit as the proverbial thirteenth juror, there is not enough conflicting testimony or evidence that would warrant a reversal on manifest weight review. This simply means that the record lacks substantive evidence to weigh against it. Applying the legal standards for assessing the sufficiency and weight of the evidence set forth by the Supreme Court of Ohio, we cannot say that the verdicts were against either. Accordingly, the fourth assignment of error is overruled.
 {¶ 29} Turning to the first assignment of error, counsel for appellant argues that, because the statute under which Kepiro was convicted can be either a third or fourth degree felony, under State v. Pelfrey,112 Ohio St.3d 422, 2007-Ohio-256, he cannot be *Page 14 
guilty of the more severe crime unless the jury made a specific finding to that effect. We hold that Pelfrey does not control, because the statute at issue in Pelfrey was mechanically different from the statute at issue here.
 {¶ 30} The state responds to appellant's argument by noting that R.C.2907.05(A) is not a basic statute with enhancements like the one inPelfrey. (Appellee's brief, at 7.) The GSI statute, rather, has multiple parts, each paragraph setting forth a separate crime, and each having a different penalty. See R.C. 2907.05(A). The state is correct.
 {¶ 31} The defendant in Pelfrey was convicted of tampering with records, under R.C. 2913.42(B)(4), a felony of the third degree. Id. at ¶ 3. Tampering with records is a first-degree misdemeanor; however, there are a number of elements that can enhance the crime to a felony of the fifth, fourth, or third degree. A conviction on the most severe level of the statute can only occur if the records at issue belonged to the government. See R.C. 2913.42(B)(4). Obviously, under the statute, whether the records belonged to the government is an essential element of the crime which must be proven to the jury beyond a reasonable doubt. See, generally, In re Winship (1970), 397 U.S. 358, 361, 90 S.Ct. 1068
(holding that the prosecution must prove each element of the crime charged beyond a reasonable doubt).
 {¶ 32} But the jury convicted Pelfrey of tampering with records, "as charged in the indictment." Pelfrey, at ¶ 17 (O'Donnell, J., dissenting). That is, they did not expressly find that the records belonged to a governmental entity, nor did they specify that they were convicting him of a third-degree felony. On appeal to the Supreme Court of Ohio, Pelfrey argued that under R.C. 2945.75 he could only be guilty of the least severe crime unless the jury's verdict form stated otherwise. Justice O'Donnell rejected that argument, *Page 15 
noting that the indictment properly put the defendant on notice that he was being tried for the third-degree felony, and that convicting him "as charged in the indictment" was the same thing as convicting him of the third-degree felony. See id. The majority, however, strictly applied R.C. 2945.75, holding that it requires that the guilty verdict state either: (1) the degree of the offense; or (2) that the additional element making it more serious is present. Pelfrey, at ¶ 4 (majority opinion). The court remanded the case with instructions to enter a conviction under the misdemeanor, interpreting R.C. 2945.75(A)(2) to mean that an unspecified guilty verdict can only constitute a finding of guilty as to the least degree of the offense charged. See id.
 {¶ 33} The reason Pelfrey does not control here is that the tampering with records statute only prohibits a single type of conduct. Depending on the attendant circumstances, that conduct can be punished in varying ways. This is similar, for example, to the theft statute, which, more or less prohibits "stealing." See R.C. 2913.02. Obviously, the punishment for stealing $13,000,000 in rare coins will be more severe than the punishment for stealing a candy bar from 7-Eleven.
 {¶ 34} The statute appellant was convicted under, R.C. 2907.05(A), essentially prohibits five different kinds of conduct — sexual conduct with another: (1) by force; (2) by deception (using drugs, alcohol, or other intoxicants); (3) knowing the other person's judgment is impaired; (4) when the victim is less than 13-years old; or (5) whose judgment is impaired because of a mental defect. Each of these is a separate offense, having a separate penalty. Under R.C. 2907.05(A), there are no additional elements or attendant circumstances that change the penalty. Therefore, unlike in Pelfrey, R.C. 2945.75 does not literally apply here. The jury convicted appellant of having sexual contact with another *Page 16 
who was less than 13-years old. See R.C. 2907.05(A)(4). The statute defines this conduct as a third-degree felony. We, therefore, overrule the first assignment of error.
 {¶ 35} Turning to the third assignment of error, the state concedes that the trial court erred by finding that the prison term was mandatory for acts committed after July 1, 1996. We, therefore, sustain this assignment of error.
 {¶ 36} The state also concedes that the trial court erred as to Counts 1 through 7 of the indictment. We, therefore, sustain the second assignment of error as to those counts.
 {¶ 37} With regard to Counts 8 through 13 of the indictment, the state argues that because the prohibited conduct could have occurredafter the General Assembly's enactment of S.B. No. 2, on July 1, 1996, appellant's conviction under these counts is proper. (Appellee's brief, at 11.) We disagree.
 {¶ 38} At issue here is which version of R.C. 2907.05 applies when the prosecution cannot prove when the alleged crime(s) occurred. In 1995, the General Assembly overhauled the Ohio Criminal Code by passing the Omnibus Criminal Sentencing Act. See Publisher's Note to R.C. 2901.01
(1996). These statutory revisions took effect July 1, 1996. As a result, any crime committed prior to July 1, 1996 is to be adjudicated under the statute previously in existence. In this case, applying the old version of R.C. 2907.05 substantially changes the outcome, at least insofar as appellant is concerned.
 {¶ 39} Under the current statutory provision, R.C. 2907.05(B)(2) provides "a presumption that a prison term shall be imposed." Under the old provision, subsection *Page 17 
(B) (2) did not exist. Thus, under the old statute there was no presumption of mandatory prison time.
 {¶ 40} A.S. testified that appellant molested her regularly throughout 1996 — about once or twice each month. (Tr. 77.) Assuming that A.S.'s testimony was true, about half the molestation incidents occurred before July 1, 1996, and half of the incidents occurred after. This assumption, however, fails to take into account the facial imprecision with which A.S. recounted her allegations. The state is essentially arguing that we should disregard that imprecision, and simply presume that appellant molested her with calendar-like regularity. (Appellee's brief, at 11.) But making this assumption would rob appellant of the constitutional guarantees of due process, and the presumption that a criminal defendant is innocent until proven guilty.
 {¶ 41} It is a cornerstone of American jurisprudence that a criminal defendant is entitled to "be informed of the nature and cause of the accusation" against him. See, generally, the Sixth Amendment to the United States Constitution; see, also, Section 10, Article 1, Ohio Constitution. Although the United States Supreme Court has yet to hold that a criminal defendant's right to indictment by grand jury vis-à-vis the Sixth Amendment to the United States Constitution is binding upon the states, the Ohio Constitution recognizes this right in Article I. See, e.g., State ex rel. Hoel v. Brown (1922),105 Ohio St. 479, 486 (holding that due process of law, as guaranteed by the United States and Ohio Constitutions, requires "some legal procedure in which the person proceeded against if he is to be concluded thereby, shall have an opportunity to defend himself"); State v. Collins (1952), 94 Ohio App. 401, 402 ("While the constitutional phrase `due process' eludes exact definition, it would seem to require in a criminal case, where the *Page 18 
liberty of a defendant is at stake, accuracy, clearness, and certainty in the charge of the court to the jury"). Cf. Section 1,Fourteenth Amendment. The rationale is that a criminal defendant cannot prepare a defense unless he or she knows precisely of the crime charged. Without that knowledge, the defendant cannot know what elements the state is required to prove, and consequently, how to negate the elements of the offense.
 {¶ 42} Though, oftentimes, courts neglect to distinguish between the different types of due process, there are two — substantive and procedural due process. Procedural due process requires that individuals be given a meaningful opportunity to be heard before their fundamental rights are encroached. See, e.g., Fuentes v. Shevin (1972), 407 U.S. 67,80, 92 S.Ct. 1983; Hoel, supra, at 486. Substantive due process protects an individual's fundamental rights, regardless of the sufficiency of the process afforded. Fundamental rights are those that are enumerated in the Bill of Rights, or those identified as fundamental rights by the United States Supreme Court. See ibid; see, also, Washington v.Glucksberg (1997), 521 U.S. 702, 721, 117 S.Ct. 2258.
 {¶ 43} Criminal trials are themselves, processes; thus, procedural due process protects how those trials are conducted. In Ohio, a criminal defendant's right to indictment is specifically enumerated in the constitution, which makes the right fundamental. Thus, criminal defendants are also entitled to substantive due process under Ohio law. It is also axiomatic that what the constitution grants, no statute may take away. Grieb v. Dept. of Liquor Control (1950), 153 Ohio St. 77, 81.
 {¶ 44} A criminal defendant is denied due process when he is convicted of a crime without the state having proved each element of the crime beyond a reasonable doubt. See, e.g., Winship, supra, at 361. Similarly, a defendant is denied due process *Page 19 
when convicted of a crime other than the crime charged (unless it is a lesser included offense). See, e.g., Cokeley v. Lockhart (C.A.8, 1991),951 F.2d 916, certiorari denied, 506 U.S. 904, 113 S.Ct. 296. InCokeley, the Eighth Circuit held that the defendant was denied due process when he was charged with rape by sexual intercourse, but the trial judge instructed the jury to return a guilty verdict if it found the state established that the defendant had forced the victim to engageeither in sexual intercourse, or deviate sexual activity — under Arkansas law, rape by sexual intercourse and rape by deviate sexual activity were two separate crimes, and the court's instruction permitted conviction for the uncharged crime of rape by deviate sexual activity. Before coming to the Eighth Circuit on collateral review, on direct appeal the defendant argued that the trial judge should not have instructed the jury on rape by deviate activity, because the State had charged him only with rape by sexual intercourse. Thus, the resulting general verdict constituted a conviction for a crime not charged. The Arkansas Supreme Court rejected that analysis, and upheld Cokeley's conviction. See Cokeley v. State (1986), 288 Ark. 349, 350-352, certiorari denied, 479 U.S. 856, 107 S.Ct. 195. The Arkansas Supreme Court specifically held that the rape statute constituted a single criminal offense with two means of commission, and concluded that the jury instructions properly comported with the language of the statute. See id; see, also, Cokeley, at 917-918.
 {¶ 45} In a criminal law context, due process is essentially the proposition that a statute must give fair warning of the conduct that it makes a crime. Bouie v. City of Columbia (1964), 378 U.S. 347, 350-351,84 S.Ct. 1697 (quoting United States v. Harriss [1954], 347 U.S. 612,617, 74 S.Ct. 808). The constitutional requirement of definiteness is violated when a criminal statute fails to give fair notice that the conduct is forbidden, *Page 20 
and no one should be held criminally responsible for conduct he or she could not reasonably understand to have been prohibited.Harriss, ibid.
 {¶ 46} This so-called fair warning requirement has even deeper roots, however, in the Ex Post Facto Clause of the United States Constitution. Section 10, Article 1, United States Constitution. Read literally,ex post facto means "after the fact." Black's Law Dictionary (8 Ed.2004) 620. These laws, of course, are prohibited. The essence of an ex post facto law is retroactivity: No statute may punish conduct that was not criminal at the time it was committed. Thus, the prohibition applies to conduct occurring before the statutory enactment that disadvantages the offender by, either: (1) altering the definition or elements of a crime; (2) increasing the punishment for its commission; or (3) depriving the defendant of any defense that was available when the act was committed. See Lynce v. Mathis (1997), 519 U.S. 433, 440-441, 117 S.Ct. 891; see, also, Collins v. Youngblood (1990), 497 U.S. 37, 42, 110 S.Ct. 2715.
 {¶ 47} Related to the fair warning requirements are the vagueness doctrine, and the rule of lenity. United States v. Laton (C.A.6, 2003),352 F.3d 286, 313-314 (Sutton, C.J., dissenting). Though the precise issue in Laton is inapposite to the issue here, the dissenting opinion provides a good backdrop of the relevant doctrines. The vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Id. (quoting United States v. Lanier [1997], 520 U.S. 259, 266-267,117 S.Ct. 1219). The rule of lenity — also known as the canon of strict construction of criminal statutes — is similar to the vagueness doctrine to the extent that the rule "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it *Page 21 
only to conduct clearly covered." Liparota v. United States (1985),471 U.S. 419, 427, 105 S.Ct. 2084; United States v. Bass (1971),404 U.S. 336, 347-348, 92 S.Ct. 515. Lanzetta v. State of New Jersey (1939),306 U.S. 451, 453, 59 S.Ct. 618. The touchstone of whether there was fair warning is whether the statute, either standing alone or as construed, made it reasonably clear that the defendant's conduct was criminal.Swann, at ¶ 33.
 {¶ 48} The rule of lenity is most commonly invoked when a statute is ambiguous (as opposed to merely vague). Id. Because "the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal," when applying the rule to an ambiguous statute, any ambiguity should be resolved in favor of the criminal defendant, rather than the government. Laton, at 314.
 {¶ 49} All this discussion of due process and the rule of lenity is relevant because appellant is arguing that the prosecution failed to prove that he committed the alleged acts after the statute at issue was amended on July 1, 1996. We agree. Furthermore, because the old and amended versions of R.C. 2907.05 are in conflict regarding the presumption of a mandatory prison term, we must apply the rule of lenity. Additionally, the fact that the revised statute provides a harsher punishment than its predecessor, sentencing appellant under the revised statute — without proof the conduct occurred after July 1, 1996 — operates as an ex post facto law. The state's argument that the conduct could have occurred after July 1, 1996 is fundamentally flawed. It is the state's burden to prove each element of each count of the indictment beyond a reasonable doubt. If the state cannot meet its burden as to any element, of any count, that count must be dismissed. Here, the state did not prove that appellant molested A.S. after July 1, 1996. *Page 22 
Therefore, a mandatory prison term was inappropriate and, accordingly, we sustain the second assignment of error in its entirety.
 {¶ 50} In sum, we overruled the first and fourth assignments of error. The conviction is therefore affirmed. We sustained the second and third assignments of error. Having found reversible error relating to sentencing, the judgment of the Franklin County Court of Common Pleas is hereby reversed, and the sentence is vacated. The case is remanded to the trial court for a new sentencing hearing consistent with the preceding instructions.
Judgment affirmed in part, reversed in part, and cause remanded forfurther appropriate proceedings.
 BROWN, J., concurs. FRENCH, J., concurs in judgment only. *Page 1